**INSTITUTE FOR JUSTICE**
Michael B. Soyfer (N.Y. Bar No. 5488580; D.C. Bar No. 230366)*
Robert Frommer (Va. Bar No. 70086)*
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
msoyfer@ij.org
rfrommer@ij.org

Daniel Woislaw (Tex. Bar No. 24138725)*
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
dwoislaw@ij.org

**MICHEL & ASSOCIATES, P.C.**
Anna M. Barvir (Bar No. 268728)
Joshua Robert Dale (Bar No. 209942)
180 E. Ocean Boulevard, Suite 200
Long Beach, California 90802
(562) 216-4444
abarvir@michellawyers.com
jdale@michellawyers.com

* *Pro hac vice* motions to be filed

*Attorneys for Plaintiffs Zhaocheng Anthony Tan, Scott West, and Colin Wolfson*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ZHAOCHENG ANTHONY TAN; SCOTT WEST; and COLIN WOLFSON, <br><br> *Plaintiffs*, <br> v. <br><br> CITY OF SAN JOSE; SAN JOSE POLICE DEPARTMENT; and PAUL JOSEPH, in his official capacity as San Jose Chief of Police, <br><br> *Defendants*. | Case No.: _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **CLASS ACTION** |

**INTRODUCTION**

1.      Every day in San Jose, drivers navigate a dense maze of ***nearly 500 AI-enhanced surveillance cameras***. When they pass one, it takes a picture, converts that into easily searchable data, and then uploads the image and data to a massive database shared among hundreds of law enforcement agencies. This happens on autopilot, without a warrant, probable cause, or even a hunch that all of these drivers are engaged in wrongdoing. In 2024 alone, this mass surveillance system collected over ***360 million*** images. Thousands of government employees across California have access to this massive trove, and they search it with abandon—nearly ***2.5 million times*** in the last six months of 2025, an average of over ***15,000 searches per day***. This civil rights lawsuit seeks to impose constitutional constraints on this mass surveillance program.

2.      The City of San Jose, California (the "**City**") and the San Jose Police Department ("**SJPD**") contracted with a technology company called Flock Safety to blanket San Jose with 474 automatic license plate reader ("**ALPR**") cameras. Unlike a police officer posted at an intersection, the cameras see and remember everything. Day or night, they photograph every passing car and use AI to analyze the images. They not only read the license plate, but also discern each car's make, color, and other distinctive features (like bumper stickers and roof racks) so that officers can search for them using Flock's "Vehicle Fingerprint" technology. That information, along with the time and location of each capture, then gets stored in a centralized database.

3.      The City initially stored all of its data for an entire year but, to quiet growing public criticism, agreed in a symbolic gesture to reduce the retention period to 30 days. That change is purely symbolic because tracking people for an entire month generates a deep record that can be mined for insights into people's otherwise obscure habits and routines. It can reveal visits to loved ones, places of worship, and more. The City has cameras on residential streets, near immigration lawyers' offices, and surrounding healthcare facilities. Every time drivers pass those cameras, their movements are captured, analyzed with AI, and uploaded to the database.

4.      The cameras make this surveillance not just possible, but easy. The sort of tracking that would have taken days of effort, multiple officers, and significant resources a decade ago now

happens automatically. Officers can choose to search for a full or partial license plate, use the "Vehicle Fingerprint" fields, type in a text description, or upload an image to search Flock's massive database. And once an officer has the results they want, they can output what Flock calls a *Vehicle Journey Map* or download the results to a spreadsheet for further analysis. With just a few more clicks, that same officer can use Flock's analytic tools to create lists of cars that visited locations of interest and even identify cars that are often seen together. Insights into habits and associations that before would have taken weeks or months of expensive surveillance are now mouse clicks away.

5.　　All of this is done without a warrant. No officer ever has to establish probable cause, swear to the facts in a warrant application, or await the approval of a judge. Instead, all they need to do is log in and enter a vague justification to pull up monthly logs of people's movements. Because of this, officers can run searches based on a hunch, idle curiosity, or even personal animus. Around the country, officers have been caught using ALPR databases to stalk their ex-partners, monitor protestors, and even track down a woman who reportedly had an abortion.

6.　　Worse still, the City shares its surveillance trove with hundreds of government entities across California. That results in over 15,000 searches per day. Given the high volume of searches and the vague justifications officials type in, effective oversight is virtually impossible. The City has admitted that federal agencies, including U.S. Immigration and Customs Enforcement ("**ICE**"), were able to get "side-door" access to the City's data by asking friendly California law enforcement officers to run searches.

7.　　Plaintiffs are ordinary, law-abiding people trapped in San Jose's dragnet. Nearly every day, they drive past the City's surveillance cameras on their way to work, to run errands, or to meet friends and family. Like most people, they try to maintain a reasonable amount of privacy in their lives. And they find it unsettling to have the City's 474 unblinking eyes leer at them as they go about their days, noting where they are and when, and storing their movements in a massive surveillance database for officers to peruse at will. They worry about how someone might use or misuse that information, especially given the minimal restrictions on access.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

8.     The City's dragnet violates the Fourth Amendment. Pervasively tracking a person's movements and then storing them in a government database is a "search." It creates precisely the type of suffocating atmosphere of surveillance the Framers adopted the Fourth Amendment to prevent. People's movements and associations over such an extended time period are their business alone. No one in 1791—or even a decade ago—would have expected that the police could automatically log their movements across nearly 500 locations at all hours of the day, seamlessly compile those observations in a database, and make that database instantly available to thousands of government employees across California. Today, the City does all of this without a warrant, probable cause, or any reason to suspect that the overwhelming majority of these people have done anything wrong.

9.     Technology has made possible intrusions that were unthinkable when the Fourth Amendment was ratified. Police no longer need to identify suspects in advance to place them under surveillance; they just surveil everyone instead. Like eighteenth-century British officers armed with general warrants, modern-day SJPD officers can search their mass surveillance troves as they see fit, with no prospective oversight from a judge. The liberty, security, and privacy of countless people are in the hands of every officer. This lawsuit is an effort to reel in this unlawful dragnet.

**JURISDICTION**

10.     This is a civil rights action brought under the Fourth Amendment to the U.S. Constitution; the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983; and the Declaratory Judgment Act, codified at 28 U.S.C. § 2201.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) and Local Rule 3-2(e). As described below, all Plaintiffs and Defendants reside in this district, and the events giving rise to Plaintiffs' claim occurred in this district.

**DIVISIONAL ASSIGNMENT**

13.    Assignment to the San Jose Division is proper pursuant to Local Rule 3-2(c) because all Plaintiffs and Defendants reside in Santa Clara County, and the events that gave rise to this lawsuit occurred in Santa Clara County.

**PARTIES**

14.    Plaintiff Zhaocheng Anthony ("**Tony**") Tan is an adult resident of San Jose, California.

15.    Plaintiff Scott West is an adult resident of San Jose, California.

16.    Plaintiff Colin Wolfson is an adult resident of San Jose, California.

17.    Defendant City of San Jose is a California charter city.

18.    Defendant SJPD is the police department for (and a political subdivision of) the City. *See* San Jose, Cal., City Charter, art. VIII, § 807(a); San Jose, Cal., Mun. Code § 2.04.4000. The SJPD is responsible for the administration and management of the City's contract with Flock.

19.    Defendant Paul Joseph is sued in his official capacity as SJPD's chief of police. In that capacity, Chief Joseph is the head of the SJPD, responsible for the "[a]dministration of the department and direction, control and supervision of all activities of all employees in the department." San Jose, Cal. Mun. Code § 2.04.040(B), .4010, .4020.

**STATEMENT OF FACTS**

*Automatic License Plate Readers*

20.    ALPRs are computer-controlled cameras mounted above ground level or on police cars. ALPRs automatically scan or capture images of all license plates that come into their view. These images are then transferred to a computer or server, which uses software to read the license plate number.

21.    ALPRs are a relatively new technology. The earliest forms date back to the late 1970s. As the technology has significantly improved and become cheaper over the past decade, it has gained more widespread adoption among law enforcement agencies.

22.     Modern ALPRs capture images of every car that passes them. Unlike a police officer, they do not blink, take breaks, or sleep. They operate around the clock and capture all cars that pass within a fixed distance, even at high speeds or at night.

23.     Once an ALPR captures a license plate, it creates a record of the location and time of capture. That information can then be stored in a database.

24.     Some companies that sell ALPRs and software services to police departments also offer their customers the ability to pool data. By opting into data sharing—or neglecting to opt out—police departments can feed their data into these multijurisdictional databases, which allow police to track people's movements across cities, states, and even the entire country.

25.     Police departments commonly compare the license plate images to "hotlists." These hotlists include license plates registered to vehicles reported stolen, people with open arrest warrants, missing persons, or those suspected of involvement in a crime.

26.     Anyone with access to a department's ALPR database can use the data to plot a person's movements in their car over time. With enough cameras, the same data can be used to reconstruct the person's movements over any time period for which data exist. A driver can be tracked to church, a doctor's office, a drug-abuse treatment clinic, a political protest, or anywhere else.

27.     Although these databases do not typically include the names of the registered owners of vehicles, an officer can easily look up that information in a separate government database using the license plate number. From there, the officer can search public records and other police databases for more information about the driver, including known addresses and associates.

28.     Because ALPRs create a record of every car that was at a location at a given time, they can reveal not just where the person driving the car went but also *who else* was there around the same time. The data can be used to deduce who a driver met or traveled with, revealing the driver's friends, colleagues, and other associations.

29.     Within the past few years, some companies have started to offer enhanced ALPRs and software to police departments across the country.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

30.    Among the largest is Flock Safety, a mass surveillance company founded in 2017. Flock claims that its "mission" is "to eliminate crime" by "collect[ing] the objective evidence police need to solve crime, which includes license plates and vehicle information."[1] Its CEO and founder's vision is "a Flock camera on every street corner."[2] Flock boasts the largest fixed ALPR network, with **more than 90,000 ALPRs in over 5,000 communities** across the country.

31.    Flock markets ALPR cameras to both public- and private-sector customers. These cameras are compact and require minimal infrastructure, making them easy to install and operate. Its standard ALPR camera, for instance, can operate around the clock, power itself with solar energy, and capture two lanes of traffic. Flock's cameras are less expensive than traditional ALPRs, which were too costly for most police departments to deploy in large numbers. Rather than buying the cameras outright, Flock's customers rent them from Flock and pay a fixed amount per camera per year for the cameras and related software services.

32.    In some ways, calling Flock's cameras ALPRs is like calling the iPhone a telephone. Flock's integrated hardware and software do much more than read license plates. When Flock's cameras photograph a car, Flock's software uses artificial intelligence to convert the car's visual features into easily searchable data. Flock markets this as "Vehicle Fingerprint." The Vehicle Fingerprint features include the car's make, type, and color, as well as other distinctive features like bumper stickers and roof racks.

33.    The cameras' capabilities have increased over time. In June 2025, Flock announced that its cameras would soon start streaming live video and capturing video clips at no extra cost with a simple software update. Flock thus distinguishes "[t]raditional LPR systems" that "primarily focus on text recognition" from its own, which enable "broader vehicle identification."[3]

34.    Those capabilities make it a breeze to quickly sift through millions—or even billions—of datapoints. A Flock user can search for a full or partial license plate. Or they can use

---

[1] https://www.flocksafety.com/blog/why-flock
[2] https://youtu.be/YGUZ9VWZ5-U&t=30
[3] https://www.flocksafety.com/blog/not-all-license-plate-readers-are-equal-when-plate-data-fails-how-do-investigations-continue

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the "Vehicle Fingerprint" fields to find and track a vehicle. Or they can take advantage of Flock's advanced search features, which leverage artificial intelligence to search for a vehicle based on a freeform text prompt (like "Bobcat skid steer on trailer") or using an uploaded image. Once an officer has the search results they want, they can create a "***Vehicle Journey Map***" showing everywhere the car has been seen or output the data into a spreadsheet for further analysis.



*Figure 1: Flock Freeform Demo*

35.     Flock offers a suite of features to help police departments make sense of the troves of data their cameras collect. These features analyze patterns of movement, flag repeat visitors to a location, identify vehicles frequently seen together through "convoy analysis," generate lists of vehicles that have visited multiple locations of interest through "multi-geo search," attempt to predict the future route a vehicle might take, and more.



*Figure 2: "Show me vehicles that were seen near this specific car multiple times"*

36. Flock enables its customers to pool their data in a centralized database. Customers can opt into nationwide or statewide databases. Or they can decide to share data with all customers within a set distance or only with specific Flock customers. Either way, Flock's system is designed to encourage its customers to share widely. By limiting the sharing of their own data, Flock customers reduce the amount of data they can access. And it is a lot: Flock claims that its customers generate **more than 20 billion** plate reads every **month**. Flock thus enables customers to track drivers not just within their own jurisdictions, but potentially across the state or entire country.

37. Flock does not contract only with law enforcement. Among its best-known private sector customers are Lowe's and Home Depot, which have Flock ALPRs in their parking lots across the country. Flock also markets to homeowners' associations, property management companies, and **even healthcare facilities and places of worship**. Flock encourages these private sector customers to share their data directly with law enforcement. And it tells law enforcement agencies that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

persuading local businesses and other organizations to buy Flock ALPR cameras is an easy way to grow the agencies' surveillance networks for free.

38.    Flock stores customers' data with Amazon Web Services. By default, it deletes the data after 30 days. If the law allows it, Flock will store a customer's data for even longer, potentially for an additional fee.

### The SJPD Contracts with Flock to Blanket San Jose in Surveillance

39.    One of the thousands of communities with Flock cameras is San Jose.

40.    San Jose is a car-dependent city. The U.S. Census Bureau estimates that about 80 percent of workers in San Jose drive alone or carpool to work (and about 13 percent work from home). One-way commutes average about 29 minutes. Few residents commute on foot or public transit. Indeed, data shows that walking trips declined by 33 percent in the San Jose-Sunnyvale-Santa Clara metropolitan area between 2019 and 2022.[4] And the City repeatedly failed to meet its goal to raise the percentage of commutes on public transit every year from 2018 to 2023, with just 2.8 percent of commuters choosing public transit.[5]

41.    In 2021, SJPD ran a pilot program with four Flock cameras at one intersection. Deeming the program a success, SJPD and the City decided to rent more of them, prompting two members of the City's Digital Privacy Advisory Taskforce to resign in protest.[6]

42.    Around that time, the City entered into an agreement with Flock to rent the cameras and obtain associated services (the "**Flock Agreement**"). The Flock Agreement's "Purpose" is "solely . . . the awareness, prevention, and prosecution of crime, bona fide investigations by police departments, and archiving for evidence gathering."

43.    Under the Flock Agreement, all collected data (including images) belong to the City. Flock may disclose the City's data only if the City authorizes the disclosure or the law requires it.

---

[4] https://learn.streetlightdata.com/hubfs/eBooks%20and%20Research/Walking%20and%20Mode%20Share%20Trends%20Report/walking-in-america-pedestrian-and-mode-share-trends.pdf
[5] https://www.sanjoseca.gov/your-government/departments-offices/energy/climate-smart-san-jose/climate-smart-data-dashboard/mobility-public-transit
[6] https://www.vice.com/en/article/the-capital-of-silicon-valley-is-ignoring-its-privacy-experts/

Despite this, the contract gives Flock a "non-exclusive, worldwide, perpetual, royalty-free right and license (during and after the Term [of the agreement]) to use and distribute" aggregated or "anonymous" data for its own purposes, whatever those may be.

44.    After the Flock Agreement was signed, Flock accidentally exposed an internal tracking dashboard that revealed that Flock had been sending images from its customers' cameras to the Philippines so that low-paid gig workers could annotate them and train Flock's AI.[7] Flock's guide for its overseas gig workers included photographs of vehicles with California license plates.

45.    At first, the City kept its ALPR data for an entire year, and it paid Flock an extra $300 per camera to store the extra data. Even the City's own privacy officer commented that "a year is excessive" and that "there is no need for that information" when it is unrelated to an investigation.[8] Under public pressure and in an effort to quiet critics, Chief Joseph recommended that the City reduce the retention period to 30 days, which is Flock's default retention period. After a hearing where residents criticized the SJPD's use of ALPRs, the City Council adopted Chief Joseph's recommendation.

46.    San Jose's camera network has grown steadily over time. By the end of 2023, it had 149 Flock ALPR cameras. Today, it has 474 (collectively, the "**Flock Cameras**"). All told, the City has paid $2,800 per camera—***over $1.3 million every year***—to maintain this mass surveillance network.[9] Mapping the locations of these cameras shows their extensive coverage:

---

[7] https://www.404media.co/flock-uses-overseas-gig-workers-to-build-its-surveillance-ai/
[8] https://www.kqed.org/news/11983813/san-jose-adding-hundreds-of-license-plate-readers-amid-privacy-and-efficacy-concerns
[9] With the reduced retention period, the cost will be $2,500 per camera, for a total of nearly $1.2 million per year.



*Figure 3: Map of the Flock Cameras (Red Dots)*

47.    This dragnet generates staggering amounts of data. According to the City, the Flock Cameras collected **over 360 million photographs** in 2024. Only a tiny sliver of those photographs were relevant to law enforcement; for instance, roughly one-quarter of one percent triggered a hotlist alert. Instead, the vast majority simply reflected the movements of ordinary people going about their daily routines.

48.    Given their density, the Flock Cameras can capture everything from anodyne chores to profoundly personal matters. There are cameras monitoring numerous residential streets. Cameras on the same block as immigration attorneys' offices. Cameras surrounding a block that contains a church, hospice facility, and many other healthcare facilities. In Alviso, the cameras can capture

Google employees heading to and from work, or people heading to churches, a Hindu temple, or an Islamic community center. On the other side of the city, numerous cameras surround the streets leading to and from the Kaiser Permanente San Jose Medical Center. These cameras and others capture people on their way to work, worship, loved ones, medical care, protests, and countless other places.



*Figure 4: Flock Cameras (Red) Near Immigration Lawyers (Green)*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



*Figure 5: Flock Cameras (Red) Around Healthcare Facilities and a Place of Worship (Green)*



*Figure 6: Flock Cameras (Red) at an Access Point to*

*Places of Worship and Religious Organizations (Green)*

*Figure 7: Flock Cameras (Red) Around Kaiser Permanente (Green)*

49.     To quell mounting criticism, the City Council adopted Chief Joseph's recommendation to prohibit Flock Cameras near reproductive healthcare facilities that perform abortions and places of worship. But the SJPD determined that these new prohibitions did not require moving any of its hundreds of cameras across San Jose, even though many are on the same block as or within a short distance from healthcare facilities and places of worship, not to mention countless other sensitive locations. Instead, by adopting extremely narrow definitions of the locations that deserved protection and by limiting which cameras qualified as *near* those locations, the City and the SJPD ensured that this supposed reform would be a purely symbolic one, with no real-world impact.

50.     SJPD strategically positioned the Flock Cameras along busy corridors, on major thoroughfares, at highway on- and off-ramps, and at city entrance and exit points. In many locations, SJPD positioned cameras on both sides of a road or at all four corners of an intersection, so that the

cameras will show not only where a car was at a given point in time, but also which direction it was heading.

51.    Given the density of the Flock Cameras throughout the city, it can be equally revealing to note where cars were *not* captured. By identifying where a car was not captured, officers can home in on its route and exclude areas where the driver did *not* go. In other words, the SJPD's decision to strategically position hundreds of Flock Cameras throughout San Jose means that the SJPD can often deduce where a person could have gone even after their car left a given camera's field of vision or during intervals when the person's car was not spotted by any cameras at all.

52.    To gauge the Flock Cameras' surveillance capabilities, Plaintiffs generated a sample of over 50,000 representative driving routes within the City of San Jose and assessed how often each route passed the Flock Cameras. It turned out that the Flock Cameras have the capability to capture the vast majority of these routes. In fact, of the captured routes, the vast majority passed two or more cameras—up to as many as fifteen on a single route.

53.    With two or more captures on a given route, SJPD officers can connect the dots and infer where someone went. This is helped by the fact that officers can also easily look up the person's home address with the license plate number and use public records to find out more information about them, including where they work and who their relatives are (as well as where those people live). All of that information helps fill in the picture, allowing police to deduce where a person might have gone in the time between captures.

54.    Surveys show that the average person makes about two to three trips in their car each day, or about 14 to 21 car trips per week.[10] Many are repeated trips between a small set of stable origins and destinations, like a person's home or office.[11] Given the coverage of the Flock Cameras in San Jose, it is near certain that a large share of those repeated, habitual trips could be reconstructed and inferred using data from the Flock Cameras. Over 30 days, that means the Flock Cameras can

---

[10] https://aaafoundation.org/wp-content/uploads/2026/01/202408-AAAFTS-American-Driving-Survey-2023.pdf
[11] *E.g.*, https://www.sciencedirect.com/science/article/pii/S2590198221000385

accumulate data on dozens of repeat trips that allow police to identify patterns, infer where people go often, deduce associations, and even spot notable departures from a routine.

55.    Every time the Flock Cameras capture a picture, Flock's software converts it into easily searchable data. The picture and accompanying data then get uploaded to Flock's centralized database, where they are stored and accessible for 30 days.

56.    Even beyond its own extensive camera network, the SJPD has access to data from thousands (if not tens of thousands) of other Flock cameras. Within San Jose, the SJPD has access to the data collected by dozens of Flock ALPR cameras owned by other government entities and private-sector Flock customers.[12] And after drivers leave the city, the SJPD can continue to track them across California. In the Bay Area alone, there are more than 1,600 Flock cameras, including 504 in San Francisco, 293 in Oakland, 109 in San Mateo County, and 86 in San Leandro, among many others.

57.    The Flock Cameras also enhance the effectiveness of the SJPD's other surveillance tools. SJPD has access to an extensive network of video cameras across the city. These cameras record around the clock and store footage for 30 days at a time, just like the Flock Cameras. Police can, and, on information and belief, do use these cameras together with the Flock cameras. An officer can search all of the locations a car has been seen and then review footage from nearby video cameras to see, for instance, if the driver turned, stopped, or got out of their car. Put differently, by leveraging Flock's easily searchable database of people's movements, an officer can quickly pull up video that provides additional context about where someone went and what they did after a Flock camera captured them. In that way, the Flock Cameras make SJPD's network of video cameras even more powerful.

---

[12] https://www.metrosiliconvalley.com/flock-catchers/



*Figure 8: SJPD's Map of Its Video Cameras*

### The SJPD Places Virtually No Restrictions on Access

58. The SJPD has granted over 1,000 employees access to the Flock system, and it has placed virtually no meaningful restrictions on their use.

59. The SJPD's Data Usage Protocol for Automated License Plate Reader Technology (the "**ALPR Policy**") was last updated on February 9, 2026. Among other things, the ALPR Policy claims to ensure that SJPD's use of ALPRs "complies with all applicable federal, state, and local laws." The ALPR Policy "serves as the 'usage and privacy policy'" required by California law.

60. According to the ALPR Policy, the SJPD's "purpose" in using ALPRs "is to improve criminal investigations and deter crime in the surrounding area" (footnotes omitted).

61. The ALPR Policy provides scant guidance on when and how officers can search the SJPD's massive Flock database. Instead, it broadly allows them to use the database "in conjunction with any patrol or investigative function in response to the investigation of felony or misdemeanor

crimes"; to "[l]ocate at-risk missing persons"; or to "[s]upport local and State safety departments in the identification of vehicles associated with criminal investigations."

62.     The ALPR Policy states it prohibits certain uses of the Flock system, albeit in broad and confusing terms. It states that the Flock Cameras cannot be used to "[c]ollect data that is not within the public view"; to "[m]onitor individual or group activities legally allowed in" California or "protected by the First Amendment"; facilitate immigration enforcement; issue "automated citations . . . without manual review"; or collect data for sale.

63.     Nothing in the ALPR Policy or the Flock Agreement requires a warrant, probable cause, or any level of individualized suspicion for the collection or use of data from the Flock Cameras. In practice, SJPD employees commonly search ALPR data without probable cause, a warrant, or individualized suspicion.

64.     Nothing in the ALPR Policy or the Flock Agreement requires advance approval or supervision for an SJPD employee to search the Flock database. Instead, the decisions of whether to search and what to search for are left entirely to the discretion of over 1,000 SJPD employees, with no prospective oversight from a judge or anyone else.

65.     Thus, every SJPD employee with access can log into Flock's system and trace the movements of any vehicle that has driven past any of the 474 Flock Cameras for at least the past 30 days. They can even follow those vehicles outside San Jose by accessing data from thousands of public and private Flock cameras across California.

66.     In 2024, SJPD reported that its employees accessed over 180,000 records in the system. According to the SJPD's Flock audit records, its employees searched its Flock database over 130,000 times between July 1 and December 9, 2025.

67.     On information and belief, the SJPD has access to Flock's advanced search package. The SJPD's audit records include a "Search Type" field that shows that SJPD employees ran searches using the following Flock features: freeform search (which uses AI to search based on user-entered text descriptions), visual search (which uses AI to search for images similar to a user-uploaded image), convoy analysis (which identifies vehicles repeatedly seen in close proximity to a

vehicle of interest), and multi-geo search (which identifies vehicles seen at a set of locations of interest).

68. SJPD's employees are not the only people who access the City's vast trove of surveillance. According to the SJPD's "Transparency Portal," the SJPD shares its data with nearly 300 other Flock customers.

69. Across all government officials with access, the SJPD's Flock data were searched nearly *2.5 million times* between July 1 and December 9, 2025, for an average of over *15,000 searches per day*.

70. Federal agencies have repeatedly searched San Jose's data through so-called "side door" access. In 20 cases, California law enforcement agencies reportedly searched the SJPD's Flock data on behalf of federal agencies.[13] Over a dozen more searches, which listed "ICE," "CBP," or "HSI," similarly appear to have been conducted for federal immigration enforcement purposes. Although California law prohibits sharing ALPR data with out-of-state agencies, that prohibition did not deter some officers from providing a workaround for federal law enforcement.

***The Flock Cameras Create a Retrospective, Long-Term Record of Tony's Movements***

71. Tony grew up in China, Japan, and the United States. Since 2022, he has lived in downtown San Jose and plans to stay for the foreseeable future. Tony values the diverse and politically active local community.

72. Tony has never been arrested or charged with a crime.

73. By training and education, Tony is a software engineer who specializes in consumer privacy. As a result, he understands how even seemingly innocuous data can open up an intimate window into people's lives, and how important it is for companies and government agencies that collect personal data to minimize how much data they collect and implement robust safeguards on data access, use, and retention.

---

[13] https://www.mercurynews.com/2026/01/15/san-jose-police-federal-searches-license-plate-data-violation-state-law/

74.    Tony is politically active. He goes to protests in downtown San Jose and across the Bay Area. He also volunteers as a legal observer to monitor ICE activity in San Jose and inform people of their rights. For instance, he recently drove to St. James Park to serve on the event safety team at a protest with more than 10,000 participants. On another occasion, he drove to San Jose Diridon Station to monitor and film federal agents in response to reports from concerned community members.

75.    Not all of Tony's driving is for activism. He commutes to work several times per week, runs errands, goes to healthcare appointments, sees his friends, and more in San Jose and the Bay Area.

76.    Tony sometimes travels to Asia, but he consciously avoids visiting China because he wants to avoid traveling to a repressive surveillance state.

77.    Yet Tony noticed similar mass surveillance cropping up around him when SJPD installed the Flock Cameras throughout San Jose. Tony firmly believes he and other San Jose residents should not have their movements tracked without a warrant just because they drive on public streets. Thousands of SJPD employees and hundreds of other government entities in California could pull up records of where Tony drove over the past 30 days and mine them for insights.

78.    The City's surveillance looms large in Tony's life. Almost immediately after he leaves home, he passes a Flock camera. And each time, the camera photographs him, converts the image into easily searchable data, and uploads the image and data to the SJPD's Flock database. The Flock Cameras record the start of virtually every trip Tony takes in his car.

79.    On information and belief, given the large number of cameras and their strategic placement, Flock Cameras have repeatedly photographed Tony's car as he has driven around San Jose to run errands, attend protests, monitor ICE activity, commute to work, go to healthcare appointments, and socialize with friends, among other things. Each time he passed a camera, it photographed his car, converted the image into searchable data, and uploaded the image and data to the SJPD's Flock database.

80.    Tony also drives around the Bay Area, including to commute to his work just outside San Jose and to see friends. On information and belief, given the large number of cameras throughout the Bay Area and their strategic placement, Flock ALPRs outside of San Jose have repeatedly photographed Tony as he drove and created a record that is accessible to the SJPD. Even his movements outside San Jose are tracked, analyzed, and fed into the database.

81.    Images of Tony's car and the associated data about his movements are stored in a database accessible to over 1,000 SJPD employees, as well as any authorized employee of the nearly 300 other government entities with access. Officers can leverage this information to follow Tony's movements throughout San Jose and even across other jurisdictions that let Flock pool their data. They can output a "Vehicle Journey Map" to see where Tony drove over whatever time period they choose. Or they can download the data or analyze it using Flock's software for insights into Tony's habits and associations.

82.    Tony finds this creepy—it reminds him of the Chinese surveillance state. From his education and experience as a software engineer focused on consumer privacy, Tony understands how even seemingly innocuous data can be revealing and prone to misuse. Given Tony's political activism, he worries that ICE or another federal agency could gain direct or side-door access to the SJPD's Flock data and use it to track his whereabouts or frustrate his efforts to document the activities of federal agents in San Jose.

83.    In addition, Tony has heard stories of ICE and other law enforcement officers retaliating against people who criticized or opposed them. For instance, ICE has been accused of using license plates to identify legal observers, so that it can show up at their homes or place them on watchlists.[14] In his view, by placing an unprecedented record of people's movements across a city in the hands of so many officers without any judicial oversight, the Flock Cameras make that type of retaliation all too easy.

---

[14] *E.g.*, https://www.politico.com/news/2026/02/23/dhs-accused-of-using-surveillance-tech-to-track-legal-observers-in-maine-00792722

84. Tony understands that people may see him out and about from time to time. But he neither wants nor expects them to track where he drives over an entire month, much less store that information in an AI-enhanced database accessible to government employees across California. Those records have the potential to reveal where he goes, what he does, and whom he associates with in a way that would have been impossible in the past. If anyone created a similar record of his movements, he would consider it stalking.

***The Flock Cameras Create a Retrospective, Long-Term Record of Scott's Movements***

85. Scott grew up in Southern California, where his father was a longtime sheriff's deputy in Riverside. His dad instilled in him a respect for law enforcement officers and what they do. Scott believes in the value of effective, accountable, and constitutional law enforcement.

86. Scott has lived in San Jose for over five years. He lives in West San Jose and works in South San Jose. Scott drives around San Jose to run errands, meet friends for dinner, and go to doctor's appointments, among other things.

87. Scott has never been arrested or charged with a crime.

88. Scott began noticing the Flock Cameras around San Jose in 2025. His interest piqued, he began researching them. What he found disturbed him. He finds it unsettling that the City is collecting so much information about where people go and storing it in a government database that over 1,000 City employees can easily access, not to mention hundreds of other government entities across California. Scott finds it deeply disturbing that someone he has never met could pull up a record of his movements with just a few mouse clicks.

89. Every day, Scott drives past the Flock Cameras. For instance, he will almost immediately encounter a Flock Camera once he leaves his residential neighborhood, no matter which way he turns. Both of the major intersections on his block have arrays of Flock cameras that capture people's movements no matter which direction they drive. Virtually every time Scott drives out of his neighborhood, these cameras photograph his car and create a persistent record of not just where he went, but also which direction he was heading. The City knows when Scott leaves his home, when he returns, and which direction he is heading nearly every time.

90.    Once Scott leaves his immediate neighborhood, he continues to pass Flock Cameras throughout the City. He often sees multiple Flock Cameras along a given route, including on his daily commute. Each time he passes a camera, it takes a photograph and creates a record that the SJPD stores for at least 30 days.

91.    Scott also drives throughout the Bay Area. Much of his social life is centered in San Francisco, which shares data from its 504 Flock ALPRs with the SJPD. And his partner, whom he visits often, lives in Foster City, which shares data from its 20 Flock ALPRs with the SJPD. On information and belief, these cameras and others throughout the Bay Area have photographed Scott's car and created a record that is accessible to the SJPD. Even his movements outside San Jose are tracked, analyzed, and fed into the database.

92.    Images of Scott's car and the associated data about his movements are stored in a database accessible to over 1,000 SJPD employees, as well as any authorized employee of the nearly 300 other government entities with access. Officers can leverage this information to follow Scott's movements throughout San Jose and even across other jurisdictions that let Flock pool their data. They can output a "Vehicle Journey Map" to see where Scott drove over whatever time period they choose. Or they can download the data or analyze it using Flock's software for insights into Scott's habits and associations.

93.    Scott finds this deeply intrusive and creepy. Even if people could see him out and about from time to time, Scott does not expect or want anyone to track where he drives over an entire month, much less store that information in an AI-enhanced database accessible to government officials across California. Those records have the potential to reveal where he goes, what he does, and whom he associates with in a way that would have been impossible in the past. If anyone created a similar record of his movements, he would consider it stalking.

### The Cameras Create a Retrospective, Long-Term Record of Colin's Movements

94.    Colin was born in San Jose and lives in the Santa Teresa neighborhood with his girlfriend.

95.    Colin has never been arrested or charged with a crime.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

96.    Colin began noticing the Flock Cameras several years ago.

97.    Colin drives past the Flock Cameras nearly every day. Until recently, one was positioned right at the entrance to his residential neighborhood. As a result, every time he returned home, that camera photographed the vehicle he was driving, converted the image into searchable data, and stored the image and data in the SJPD's database. Even after the removal of that camera, Colin must still pass a Flock camera within a mile of his home to get to a major thoroughfare. Every day as they have commuted, Colin and his girlfriend pass Flock Cameras. And each time, the cameras have taken a photograph of the car and have stored a record of that capture in SJPD's database.

98.    After leaving his neighborhood, Colin has noticed Flock Cameras throughout San Jose as he drove to meet up with friends, shop for groceries, practice at the gun range, get medical care, and go hiking, among other things. He often counts numerous Flock Cameras during these daily travels. Each time he passes a camera, it takes a photograph and creates a record that the SJPD stores.

99.    Colin also drives around the Bay Area for much the same reasons. On information and belief, given the large number of cameras throughout the Bay Area and their strategic placement, Flock cameras outside of San Jose have repeatedly photographed Colin as he drove and created records that are accessible to the SJPD. Even his movements outside San Jose are tracked, analyzed, and fed into the database.

100.    All of this surveillance bothers Colin. He believes that it intrudes on his privacy. The government should not be creating detailed records of where he was at any given point in time and storing that record in a database easily accessible to thousands of officers without a warrant. Until he learned about the Flock Cameras, Colin's expectation was that the government could not and would not compile such a record of his movements. Those records have the potential to reveal where he goes, what he does, and whom he associates with in a way that would have been impossible in the past. If anyone created a similar record of his movements, he would consider it stalking.

**INJURY TO PLAINTIFFS**

101.    Using the Flock Cameras, Defendants create running, 30-day records of Plaintiffs' movements throughout San Jose. Unless enjoined, they will continue to do so indefinitely.

102.    On information and belief, the Flock Cameras have repeatedly photographed Tony's car as he drove to work, went about his routines, and went to protests and the sites of reported ICE activity in San Jose, among other things.

103.    After the Flock Cameras photographed Tony's car, Flock's software used AI to read the license plate and generate Vehicle Fingerprint data fields. Every image and the associated data were stored in Flock's database for 30 days to one year, where they were accessible to anyone with access. Officers could thus effortlessly pull up a record of where Tony drove without a warrant or even probable cause.

104.    On information and belief, the Flock Cameras have repeatedly photographed Scott's car nearly every time he left his home, as he commuted and went about his routines, and as he met friends in San Jose and the broader Bay Area, among other things.

105.    After the Flock Cameras photographed Scott's car, Flock's software used AI to read the license plate and generate Vehicle Fingerprint data fields. Every image and the associated data were stored in Flock's database for 30 days to one year, where they were accessible to anyone with access. Officers could thus effortlessly pull up a record of where Scott drove without a warrant or even probable cause.

106.    On information and belief, the Flock Cameras have repeatedly photographed Colin's car nearly every time he returned home, commuted, ran errands, saw his friends, and otherwise went about his routines.

107.    After the Flock Cameras photographed Colin's car, Flock's software used AI to read the license plate and generate Vehicle Fingerprint data fields. Every image and the associated data were stored in Flock's database for 30 days to one year, where they were accessible to anyone with access. Officers could thus effortlessly pull up a record of where Colin drove without a warrant or even probable cause.

108. Because of the Flock Agreement and the ALPR Policy, every image the Flock Cameras capture of Plaintiffs' vehicles, along with associated data, is stored for 30 days in a centralized database maintained by Flock.

109. Because of the Flock Agreement and the ALPR Policy, a record of Plaintiffs' movements over at least the previous 30 days is accessible to any SJPD officer and anyone else the SJPD has granted access.

110. The SJPD has a policy or custom of allowing its officers to access data from the Flock Cameras without a warrant or any other form of prior approval. Thus, any SJPD officer can access a record of Tony's, Scott's, Colin's, or any other driver's movements over at least the past 30 days without a warrant or any other form of prior approval.

111. The SJPD has a policy or custom of not requiring its officers to have probable cause or any level of individualized suspicion to access data from the Flock Cameras. Thus, any SJPD officer can access a record of Tony's, Scott's, Colin's, or any other driver's movements over at least the past 30 days without probable cause or any level of individualized suspicion.

112. The Flock Agreement and the ALPR policy give individual officers near-total discretion over whether to access Plaintiffs' information and how to use it.

**CLASS ACTION ALLEGATIONS**

113. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs seek to maintain this action as representative parties on behalf of all others similarly situated.

114. Plaintiffs intend to ask the Court to certify a class comprising all San Jose residents who were drivers of vehicles that, after April 15, 2025, were photographed or, at any future date, will be photographed by the Flock Cameras.

115. This class satisfies Rule 23(a)'s prerequisites:

   a. *Numerosity*: In 2024 alone, the Flock Cameras captured over 360 million photographs of vehicles. Even assuming some drivers were captured many times, the class would still easily number in the hundreds of thousands, if not millions. Joinder of so many class members would impose severe logistical burdens for

27
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

little, if any, benefit—all the more so because the class includes future members who, by definition, could not practicably be joined.

b. *Commonality*: Resolution of the claims necessarily depends on factual and legal questions that are common to the class because every person who drives through this surveillance network is subject to an unconstitutional, warrantless search. The common questions therefore include (among others):

i. Whether Defendants have a policy or custom of using the Flock Cameras to collect information without a warrant, probable cause, or any form of individualized suspicion;

ii. Whether Defendants have a policy or custom of allowing SJPD employees and others to access information collected by the Flock Cameras without a warrant, probable cause, or any form of individualized suspicion;

iii. Whether the collection of location data by the Flock Cameras has the capacity to reveal habits and routines;

iv. Whether the Flock Cameras enable officers to glean insights from people's movements that are inconsistent with traditional expectations of privacy in public; *and*

v. Whether Defendants' use of the Flock Cameras violates an expectation of privacy that society recognizes as objectively reasonable.

c. *Typicality*: Plaintiffs' claims for declaratory and injunctive relief are typical of the class because they assert the same Fourth Amendment claim as members of the class. On information and belief, each plaintiff has been and will be photographed by the Flock Cameras multiple times while driving a vehicle. Data corresponding to those photographs has been, is, and will be stored in the SJPD's Flock database for 30 days to one year before it is deleted. Each member of the

class has suffered this same injury because each class member has been subject to the same unconstitutional surveillance.

  d. *Adequacy*: Plaintiffs and their counsel are adequate.

    i. Plaintiffs have a personal stake in the outcome of this case because they have experienced the same unlawful policies or customs as the class. They are seeking a class-wide injunction that would benefit all members of the class equally. They are committed to seeing this case through to its end, including participating in the discovery process and appearing in Court, as required. They do not intend to seek a resolution of this case that would benefit them personally, at the expense of the class. And they are not seeking damages other than nominal damages, so they have no financial or other incentive to settle the case at the expense of the class's legal interests.

    ii. Plaintiffs' counsel are adequate. They have expended substantial resources investigating the claims. They have experience litigating similar claims in federal court. Indeed, among Plaintiffs' counsel are lawyers who litigated the only federal case challenging ALPRs that has advanced through discovery. *Schmidt v. City of Norfolk*, No. 2:24-cv-621 (E.D. Va. filed Oct. 21, 2024). They bring substantial experience to this case, and the Institute for Justice will commit all the resources necessary to litigate this case through class certification and to a final judgment. The Institute for Justice has litigated multiple class actions against government entities for violations of constitutional rights, obtaining favorable judgments or settlements in many of them.[15] Mr. Frommer

---

[15] *See, e.g., Sparger-Withers v. Taylor*, 628 F. Supp. 3d 821, 832 (S.D. Ind. 2022); *Sourovelis v. City of Philadelphia*, 2021 WL 344598 (E.D. Pa. Jan. 28, 2021); *Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF No. 111); *Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF No. 116).

recently prevailed in a Fourth Amendment case before the U.S. Court of Appeals for the Ninth Circuit, which remanded the case to the district court for the entry of a class-wide injunction.[16]

116. The class also satisfies Rule 23(b)(2)'s uniformity requirements. Plaintiffs challenge Defendants' policies or customs of operating the Flock Cameras, storing data for 30 days, and permitting widespread access to those data without a warrant, probable cause, or individualized suspicion. These policies and practices apply generally to the class as a whole. As detailed below, Plaintiffs seek uniform relief from a policy or custom that applies to the entire class, not individualized relief.

## CLAIM FOR RELIEF

### Violation of Plaintiffs' Fourth Amendment Rights

### (42 U.S.C. § 1983 and the Declaratory Judgment Act)

117. The Fourth Amendment to the U.S. Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."

118. The Fourth Amendment applies to state and local government entities, such as Defendants, through the Fourteenth Amendment's Due Process Clause.

119. Defendants' use of the Flock Cameras is a search under the Fourth Amendment.

    a. Defendants' use of the Flock Cameras violates a subjective expectation of privacy that society is prepared to recognize as objectively reasonable.

        i. Tony, Scott, and Colin all have a subjective expectation of privacy in their long-term movements in their cars. Their expectation is that, as a practical matter, neither an ordinary person nor the SJPD could or would create running 30-day records of their movements throughout San Jose and other places with Flock cameras. Before they learned

---

[16] *Snitko v. United States*, 90 F.4th 1250 (9th Cir. 2024) (reversing grant of summary judgment to Defendants and remanding for entry of class-wide injunctive relief).

about the Flock Cameras, they would not have expected that a group of people or even police officers would post themselves at nearly 500 locations across San Jose—day and night—to catalogue every time someone drove past and then store that information in a massive database for 30 days or more. Any affirmative steps they might take to avoid the Flock Cameras would be impractical (such as rerouting every trip to avoid the camera locations, driving offroad, or taking only public transit). Nor could they possibly memorize the locations of all 474 cameras to reliably navigate around them.

ii.    Society's expectation has been that the government would not and could not create a retrospective catalogue of every person's movements across hundreds of strategically chosen locations in a city. Although such surveillance was always possible for suspects in criminal investigations, society has generally expected that resource constraints would make that type of surveillance impractical—if not impossible—for ordinary people who were not under suspicion. But with the Flock Cameras, Defendants need not identify a suspect in advance. Instead, Defendants' system just surveils everyone and stores records of their movements on the off chance that those records might be useful in a later investigation. Software enhancements make it cheap, easy, and efficient to create, search, and mine those records for insights into people's movements. This high-tech dragnet contravenes society's traditional expectation of privacy by generating a long-term, retrospective, and easy-to-search government database of people's movements, with no requirement that police have a warrant, probable cause, or even individualized suspicion to collect or search the data.

31
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

b.      Defendants' use of the Flock Cameras is also purposeful investigative conduct that would have qualified as a search at the Founding.

120.    Defendants' use of the Flock Cameras is an *unreasonable* search under the Fourth Amendment.

a.      The Fourth Amendment prohibits searches, including electronic surveillance, unless the government has obtained a specific warrant supported by probable cause. This requirement is subject only to a few, narrow exceptions. None of these exceptions apply to Defendants' warrantless, suspicionless operation of the Flock Cameras.

b.      Defendants' use of the Flock cameras threatens the people's right to be secure in their persons. Defendants' indiscriminate, suspicionless surveillance allows them to track people's movements over rolling 30-day periods without a specific warrant, probable cause, or even individualized suspicion. SJPD employees, in turn, can exercise their own discretion to determine whether to search this vast database and what to search for, again without any requirement that they have a specific warrant, probable cause, or even individualized suspicion. That power places the liberty and security of every person in the hands of every government official with a Flock user login.

121.    The Flock Agreement and the ALPR Policy are official municipal policies, adopted under color of state law, that violate Plaintiffs' rights.

122.    Defendants have a policy or custom of providing over 1,000 of their employees with access to their Flock database.

123.    Defendants have a policy or custom of providing access to their Flock database to every person granted access by any of the nearly 300 entities with which Defendants share their Flock data.

124.    Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to collect information using the Flock Cameras.

125.   Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to access, use, or search Flock's database.

126.   Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to download and store the photographs and other information that the Flock Cameras collect.

127.   Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to access, use, or search information downloaded from Flock's database.

128.   Defendants have a policy or custom of giving over 1,000 of their employees discretion over whether and how to access and use the information available in, or downloaded from, Flock's database.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

a.   Declaring that Defendants' policies and customs described in this Complaint are unlawful and violate the Fourth Amendment (as incorporated through the Fourteenth Amendment) to the U.S. Constitution;

b.   Permanently enjoining Defendants from operating the Flock Cameras in the manner described in this Complaint, by requiring Defendants to delete any images captured by the Flock Cameras and the associated data within 24 hours, unless (i) the SJPD has a specific warrant based on probable cause to collect and/or retain the images and data or (ii) an exception to the warrant requirement applies (or, in the alternative, not to access, or permit any third party to access, any images or associated data that are more than 24 hours old, unless (i) the SJPD, or the third party, obtains a specific warrant based on probable cause to access the images and data or (ii) an exception to the warrant requirement applies);

c.   Awarding nominal damages to each named Plaintiff in the amount of $1.00;

d.    Awarding Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including, but not limited to, fees, costs, and disbursements recoverable under 42 U.S.C. § 1988; *and*

e.    Ordering all other relief to which Plaintiffs and the Class are entitled, regardless of whether such relief is demanded in this Complaint.

Dated: April 15, 2026

Respectfully submitted,

*/s/ Anna M. Barvir*

Anna M. Barvir (Bar No. 268728)
Joshua Robert Dale (Bar No. 209942)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, California 90802
(562) 216-4444
abarvir@michellawyers.com
jdale@michellawyers.com

Michael B. Soyfer
  (N.Y. Bar No. 5488580; D.C. Bar No. 230366)*
Robert Frommer
  (Va. Bar No. 70086)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
msoyfer@ij.org
rfrommer@ij.org

Daniel Woislaw
  (Tex. Bar No. 24138725)*
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
dwoislaw@ij.org

*Attorneys for Plaintiffs*

* *Pro hac vice* motions to be filed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF