Michael B. Soyfer (pro hac vice)
Robert Frommer (pro hac vice)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
msoyfer@ij.org
rfrommer@ij.org

Daniel Woislaw (pro hac vice)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, Texas 78701
(512) 480-5936
dwoislaw@ij.org

Anna M. Barvir (Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, California 90802
(562) 216-4444
abarvir@michellawyers.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ZHAOCHENG ANTHONY TAN; SCOTT WEST; and COLIN WOLFSON, *Plaintiffs*, v. CITY OF SAN JOSE; SAN JOSE POLICE DEPARTMENT; and PAUL JOSEPH, in his official capacity as San Jose Chief of Police, *Defendants*. | Case No. 5:26-CV-03181-BLF **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS** Hearing Date: October 1, 2026 Hearing Time: 9:00 a.m. |

TABLE OF CONTENTS

Table of Contents ..................................................................................................................... ii

Table of Authorities ................................................................................................................ iii

Introduction ............................................................................................................................. 1

Statement of the Issues ........................................................................................................... 3

Factual Background................................................................................................................. 3

Legal Standard......................................................................................................................... 6

Argument.................................................................................................................................. 7

I.    Plaintiffs plausibly alleged that San Jose's Flock System effects a warrantless search in violation of the Fourth Amendment. ...................................................................................... 7

A.    *Carpenter* laid the groundwork for a multifactor test to determine when new surveillance technologies contravene a reasonable expectation of privacy. .............................. 8

B.    Plaintiffs plausibly alleged that San Jose's Flock System contravenes a reasonable expectation of privacy under the *Carpenter* factors................................................................. 11

i.    Factor 1: San Jose's Flock System has the capability to reveal intimate patterns and visits to sensitive locations. ................................................................................................ 12

ii.    Factor 2: San Jose's Flock System is cheap, easy, and efficient compared to traditional police surveillance techniques. ......................................................................... 16

iii.    Factor 3: San Jose's Flock data have a retrospective quality that means this newfound tracking capacity runs against everyone.......................................................... 18

C.    Supreme Court precedent forecloses Defendants' argument that no search happens absent human review................................................................................................................ 19

II.    There is no basis to dismiss either SJPD or Chief Joseph in his official capacity. ............. 23

III.    Defendants have not met their heavy burden to justify striking the class allegations. ....... 23

Conclusion.............................................................................................................................. 25

TABLE OF AUTHORITIES

**Cases**

*A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828 (9th Cir. 2022) .................................................... 24

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015)............................................................................... 22

*Arizona v. Hicks*, 480 U.S. 321 (1987)............................................................................................ 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................ 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................. 6

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) ..................................................................... 18

*California ex rel. RoNo, LLC v. Altus Fin. S.A.*, 344 F.3d 920 (9th Cir. 2003).............................. 15

*Carpenter v. United States*, 585 U.S. 296 (2018) ...................... 1, 2, 7-11, 13, 15, 16, 18, 19, 21, 22

*Chatrie v. United States*, 146 S. Ct. 2193 (2026)................................................. 1, 2, 7-18, 20, 21, 24

*Chinitz v. Intero Real Est. Servs.*, 2020 WL 7391299 (N.D. Cal. July 22, 2020)........................... 24

*Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*,
    533 F.3d 780 (9th Cir. 2008).................................................................................................... 23

*Delaware v. Prouse*, 440 U.S. 648 (1979) ..................................................................................... 21

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007) ..................... 23

*Illinois v. Lidster*, 540 U.S. 419 (2004).......................................................................................... 17

*In re Future Motion, Inc. Prods. Liab. Litig.*,
    2024 WL 3408224 (N.D. Cal. July 12, 2024) ............................................................................ 7

*In re Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015) ............................................................. 24

*Katz v. United States*, 389 U.S. 347 (1967)...................................................................................... 9

*Kyllo v. United States*, 533 U.S. 27 (2001) ........................................................... 2, 9, 16, 20, 21, 22

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ................................................................................... 11, 13, 14, 16, 21

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008)................................. 6

*New York v. Class*, 475 U.S. 106 (1986)......................................................................................... 21

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014)............................................................................... 24

*Payton v. New York*, 445 U.S. 573 (1980) ...................................................................................... 18

*Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158 (9th Cir. 2022).................................. 12

*Sanchez v. Los Angeles Department of Transportation*, 39 F.4th at 559 (9th Cir. 2022) ......... 21, 22

*Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492 (E.D. Va. 2026) .................................................. 15

*Scholl v. Ill. State Police*, 776 F. Supp. 3d 701 (N.D. Ill. 2025)..................................................... 15

*Schuchardt v. President of the U.S.*, 839 F.3d 336 (3d Cir. 2016).................................................. 22

*Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir. 1986) ........................ 23

*Sinclair v. San Jose Unified Sch. Dist. Bd.*,

    2021 WL 2948871 (N.D. Cal. July 13, 2021) .............................................................................. 23

*Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001) ....................................................... 23

*Taylor v. Shutterfly, Inc.*, 2020 WL 1307043 (N.D. Cal. Mar. 19, 2020)................................... 7, 24

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) ................................... 23

*United States ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*,

    169 F.4th 1137 (9th Cir. 2026)............................................................................................... 6, 7

*United States v. Cortez*, 449 U.S. 411 (1981) ................................................................................. 16

*United States v. Di Re*, 332 U.S. 581 (1948)...................................................................................... 9

*United States v. Jones*, 565 U.S. 400 (2012)................................................... 1, 9, 13, 16, 17, 20, 21

*United States v. Karo*, 468 U.S. 705 (1984)..................................................................................... 20

*United States v. Knotts*, 460 U.S. 276 (1983) .................................................................................. 21

*United States v. Martin*, 753 F. Supp. 3d 454 (E.D. Va. 2024) ....................................................... 15

*United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) .............................................................. 13

*United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999) .................................................................. 21

*United States v. Moalin*, 973 F.3d 977 (9th Cir. 2020) .................................................................... 21

*United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) ......................................................... 9, 22

*United States v. Porter*, 170 F.4th 381 (5th Cir. 2026) ................................................................... 15

*United States v. Rubin*, 556 F. Supp. 3d 1123 (N.D. Cal. 2021)...................................................... 15

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) ............................................................... 12, 22

*United States v. Spurlock*, 778 F. Supp. 3d 1136  (D. Nev. 2025).................................................. 19

*United States v. Sturdivant*, 786 F. Supp. 3d 1098 (N.D. Ohio 2025) ............................................ 15

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ............................................................... 22

*United States v. Yang*, 958 F.3d 851 (9th Cir. 2020) ....................................................................... 15

*Wikimedia Found. v. NSA*, 857 F.3d 193 (4th Cir. 2017) ................................................................ 22

*Wynn v. UPS*, 2024 WL 3560727 (N.D. Cal. July 26, 2024) ............................................................. 6

**Other Authorities**

2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:26, Westlaw

    CLASSACT (6th ed. June 2026 update) ..................................................................................... 24

Ilse M. Harms et al., *The Role of Route Familiarity in Traffic Participants' Behaviour and*

    *Transport Psychology Research: A Systematic Review*, 9 Transp. Rsch. Interdisc. Persps., Mar.

    2021, at § 1.1, https://bit.ly/4trUGGQ ..................................................................................... 13

Laura K. Donohue, *Bulk Metadata Collection: Statutory and Constitutional Considerations*,

    37 Harv. J.L. & Pub. Pol'y 757 (2014) ..................................................................................... 20

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................... 6, 12

Federal Rule of Civil Procedure 17(b) ............................................................................................. 23

Federal Rule of Civil Procedure 23(b)(2) ............................................................................... 3, 23, 24

Federal Rule of Civil Procedure 23(b)(3) ....................................................................................... 23

## INTRODUCTION

Defendants' burden was to show that Plaintiffs did not plead enough facts to state a plausible claim under any cognizable legal theory. They failed to do that. Instead, their Motion to Dismiss and Strike Class Allegations (the "**Motion**" or "**MTD**") ignores key allegations, tries to shoehorn the facts into strawman legal theories, and advances legal arguments that the Supreme Court and Ninth Circuit have rejected. After correcting those errors and accepting Plaintiffs' well-pleaded facts as true, the Complaint states a plausible claim under a cognizable legal theory: Defendants' warrantless dragnet surveillance contravenes Plaintiffs' reasonable expectation of privacy in their physical movements and thereby violates the Fourth Amendment.

At the outset, Defendants garble the legal standard. In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court recognized that people have a reasonable expectation of privacy in their physical movements. That followed from *United States v. Jones*, 565 U.S. 400 (2012), where "five Justices had agreed that" GPS tracking of a car violated a reasonable expectation of privacy "even though the movements occurred in public." *Chatrie v. United States*, 146 S. Ct. 2193, 2206 (2026). To determine whether a less precise surveillance technology *contravened* that expectation in *Carpenter*, the Court homed in on three key factors rooted in Founding-era expectations of privacy. It considered whether the surveillance had the capability to reveal intimate details, evaded the resource constraints that historically limited pervasive government surveillance, and enabled police to travel back in time to reconstruct past movements. *See Carpenter*, 585 U.S. at 311-12. Yet Defendants insist that *Carpenter*'s test is a quantitative one that only applies when the surveillance is "comprehensive." MTD at 11, 17. But just this term, the Supreme Court rejected the notion that the *quantity* of data is dispositive. *See Chatrie*, 146 S. Ct. at 2210 & n.9. Instead, to figure out whether police conducted a search by acquiring "only two hours" of Location History data from Google, the Court again focused on the same factors "*Carpenter* relied on." *See id.* at 2208, 2211.

Properly framed, the Complaint alleges more than enough facts to state a plausible claim. *First*, San Jose's 474 Flock automated license plate reader ("**ALPR**") cameras (collectively, San Jose's "**Flock System**") have the capability to reveal intimate details in two ways. They can reveal intimate patterns because, as Plaintiffs alleged, they have the capability to collect data on virtually

all of people's routine and habitual movements in their cars. And they can reveal visits to sensitive locations, including the many expressly alleged in the Complaint. *Second*, San Jose's Flock System is far cheaper, easier, and more efficient than any analogous form of traditional police surveillance. For the price of a modest line item on the city budget, it amasses hundreds of millions of lines of data on people's movements every year and allows officers to sift through this massive trove quickly using artificial intelligence ("**AI**"). *Third*, San Jose's Flock System indiscriminately collects and stores everyone's data, even if police have no reason to suspect a driver when the information is collected. This hearkens back to indiscriminate general searches that allowed officers to search without suspicion or the oversight of a neutral judge.

Defendants offer little in the way of contrary argument, largely rehashing contentions the Supreme Court rejected in *Carpenter* and again in *Chatrie*. Instead, their primary tack is to argue that Plaintiffs have no expectation of privacy in the exteriors of their cars or in their routes from one place to another. But just like *Carpenter* was "not about 'using a phone' or a person's movement at a particular time," 585 U.S. at 315, this case is not about driving a car or a person's route on a particular trip. Plaintiffs are challenging a dragnet surveillance system that aggregates their movements and everyone else's into a database that police can mine for insights with no judicial supervision. Defendants' arguments therefore miss the forest for the trees. And if Defendants are arguing that no search happens absent human review, the Supreme Court has rejected the proposition that a search only happens once a person reviews surveillance data and infers intimate details. *See Kyllo v. United States*, 533 U.S. 27, 36-37 & n.4 (2001). To hold otherwise would create an automation exception to the Fourth Amendment—an untenable outcome at a time when AI can collect, sift through, and analyze data without human involvement.

The Court can easily reject Defendants' remaining two requests for relief. Ninth Circuit precedent forecloses their argument that the San Jose Police Department ("**SJPD**") lacks the capacity to be sued. And the precedent they rely on to argue the Court should dismiss Chief Joseph merely provides that the Court *may* dismiss official capacity claims as redundant to avoid jury confusion, which is not an issue given that this case will be tried to the Court. Defendants' arguments for short-circuiting the class certification process are likewise meritless. Courts routinely certify

Rule 23(b)(2) injunctive relief classes that include future members. And whether officers "queried" Plaintiffs' data has no relevance to standing or any of Rule 23's certification requirements.

For these reasons and those that follow, Defendants have failed to meet their burden. Their motion should be denied.

## STATEMENT OF THE ISSUES

1. Plaintiffs alleged that San Jose's Flock System has the capacity to reveal intimate details of people's lives, that this surveillance is cheap and easy compared to traditional surveillance, and that the retrospective quality of the data means this newfound surveillance capacity runs against everyone. Do their allegations plausibly establish that this warrantless surveillance contravenes a reasonable expectation of privacy in people's physical movements, even though each individual image or datapoint may not be private standing alone?

2. (a) Under long-established Ninth Circuit precedent, SJPD has the capacity to be sued in federal court. Should the Court dismiss SJPD even though Defendants have not tried to distinguish this precedent? (b) To avoid jury confusion, Ninth Circuit precedent permits dismissing official capacity claims as duplicative of claims against a government entity. Does that precedent warrant dismissing Chief Joseph in his official capacity even though this case will be tried to the Court?

3. Motions to strike class allegations are heavily disfavored and granted only where the arguments against certification are beyond dispute. Defendants claim this standard is met because the class includes future members and Plaintiffs did not allege an officer ever "queried" their data. Have Defendants met their heavy burden here even though neither of these factors would preclude certification of a Rule 23(b)(2) class?

## FACTUAL BACKGROUND

SJPD rents 474 ALPRs from a company called Flock Safety. Compl. ¶¶ 30, 39, 45-46. Although ALPRs have existed for decades, Flock's ALPRs have far more advanced surveillance capabilities than traditional systems. *Id.* ¶¶ 22-35. They can operate around the clock, see in the dark, and photograph every passing car, even at high speeds. *Id.* ¶¶ 22, 31-34. Once they capture an image, they use AI to translate the features of any cars in the image into searchable data, including

the license plate, make, type, color, and other distinctive features like roof racks and bumper stickers. *Id.* ¶¶ 32, 55. Flock calls this capability "Vehicle Fingerprint." *Id.* ¶ 32. Each image and the associated data then get uploaded to a central database along with the time and location of capture. *Id.* ¶¶ 23, 36, 55. By default, Flock stores data for 30 days but will hold onto them for longer if the customer asks. *Id.* ¶ 38. Flock's customers then decide how to share their data—on a one-on-one basis, statewide, or even nationally. *Id.* ¶¶ 36, 45.

Across the country, Flock's ALPRs now generate more than 20 billion plate reads every month. *Id.* ¶ 36. To help its customers glean insights from this vast trove of data, Flock bundles its ALPRs with advanced software features. *Id.* ¶¶ 31-35. Users can search for a full or partial license plate number. *Id.* ¶ 34. They can run broad searches using the Vehicle Fingerprint filters. *Id.* Or they can just type what they are looking for into a search bar and have Flock's AI find matching images. *Id.* Beyond its advanced search capabilities, Flock has a growing set of analytic tools. *Id.* ¶¶ 33-35. For instance, users can automatically output a "Vehicle Journey Map" showing a vehicle's journey over any time period for which data are available. *Id.* ¶ 34. They can also identify vehicles that are frequently seen together, compile lists of vehicles that visited multiple locations of interest, and even predict a vehicle's likely route after it was spotted by an ALPR. *Id.* ¶ 35.

After starting as a small pilot program in 2021, San Jose's Flock System has swelled to a vast network of 474 ALPRs. *Id.* ¶¶ 41, 46-47, fig. 3. SJPD rents them and gets access to Flock's software capabilities for $2,500 per ALPR per year. *Id.* ¶¶ 31, 46. To maximize the data its Flock System collects, SJPD strategically positioned ALPRs along busy corridors and around intersections. *Id.* ¶ 50. Unsurprisingly, then, San Jose's Flock System amasses staggering amounts of data. In 2024, for instance, it captured over 360 million photographs, each of which could contain multiple cars. *Id.* ¶ 47. Beyond its own extensive network, SJPD has access to data from thousands of ALPRs across the Bay Area, including dozens of privately owned ALPRs within city limits. *Id.* ¶ 56. Although SJPD initially stored all its Flock data for an entire year, Chief Joseph recommended changing the retention period to 30 days in response to mounting public criticism, and the City Council rubber-stamped his decision despite continued protests. *Id.* ¶ 45.

Key allegations plausibly support the inference that this dragnet can reveal intimate details, yet Defendants tellingly ignore them. MTD at 4-6. *First*, driving is the primary way people get around San Jose and the Bay Area, so people have scant capacity to escape the surveillance. Compl. ¶¶ 40, 119(a)(i). *Second*, Plaintiffs generated a sample of over 50,000 representative routes to assess the overall surveillance capabilities of San Jose's Flock System. *Id.* ¶ 52. That showed that San Jose's Flock System could generate enough data to enable reconstruction of the vast majority of driving routes in the city. *Id.* ¶¶ 52-53. Because people drive a stable set of habitual routes, that plausibly supports the inference that San Jose's Flock System can reveal patterns and routines. *Id.* ¶ 54. (As mentioned, Flock can even automate that process by generating a "Vehicle Journey Map." *Id.* ¶ 34.) *Third*, Plaintiffs identified ALPRs near sensitive locations like immigration lawyers' offices, places of worship, and healthcare facilities. *Id.* ¶¶ 48-49, figs. 4-7. Data from those ALPRs can reveal when people visited one of those locations and help identify others with whom they associated. *Id.* ¶¶ 26, 48. (As mentioned, Flock automates these processes, too. *See id.* ¶¶ 34-35, 67.)

SJPD has nonetheless given thousands of government employees across California virtually unfettered access to these data. *Id.* ¶¶ 58, 63-65, 68. That includes over 1,000 SJPD employees, who collectively searched San Jose's Flock database over 130,000 times in the second half of 2025. *Id.* ¶¶ 58, 66. It also includes employees of 300 other government entities in California, who collectively searched San Jose's Flock database an astonishing 15,000 times per day, on average, over that same timeframe. *Id.* ¶¶ 68-69. Neither the collection of information nor any of these searches required a valid warrant, probable cause, or any form of individualized suspicion. *Id.* ¶¶ 61-64, 110-12, 121-28. Instead, SJPD has indiscriminately surveilled countless people and entrusted sensitive records of their physical movements to the discretion of an unknown number of government employees across the state. *Id.* ¶¶ 47, 121-28. And it will continue to do so indefinitely unless enjoined. *Id.* ¶ 101.

Plaintiffs are three San Jose residents caught in this dragnet. *Id.* ¶¶ 71-100. Tony is a politically active privacy engineer who sees parallels to China's repressive surveillance state and worries about how someone could deploy this unprecedented surveillance against him. *Id.* ¶¶ 71-84.

Scott's father was in law enforcement, but he still finds it creepy that anyone with access to this trove could pull up a deep record of his movements without a warrant. *Id.* ¶¶ 85-93. Colin, too, finds this heavy-handed surveillance of his and other people's movements disturbing and overbearing. *Id.* ¶¶ 94-100. All three drive around San Jose nearly every day, and all three have seen Flock ALPRs many times along their daily routes, sometimes immediately outside their homes or neighborhoods. *Id.* ¶¶ 74-75, 78-81, 86, 88-92, 96-100, 102-07. And that means San Jose's Flock System has repeatedly created running 30-day records of their movements and stored those records in a database that thousands of government employees search thousands of times every day without a warrant, probable cause, or individualized suspicion. *Id.* ¶¶ 108-12.

Plaintiffs filed their Complaint in April, alleging a single Fourth Amendment claim on behalf of themselves and a putative class of San Jose residents. *Id.* ¶¶ 113-14, 117-28. Their Complaint seeks $1.00 in nominal damages for each named plaintiff, as well as declaratory and injunctive relief for the class. *Id.* at pp. 33-34. Defendants have moved to dismiss all claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss SJPD and Chief Joseph as improper parties, and to strike the class allegations. ECF No. 28.

## LEGAL STANDARD

***Failure to state a claim.*** "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making that determination, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to" Plaintiffs. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Ninth Circuit precedent "disfavor[s] dismissing a case at the pleading stage unless 'there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'" *United States ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*, 169 F.4th 1137, 1142 (9th Cir. 2026) (citation omitted).

***Striking class allegations.*** "[M]otions to strike class allegations are generally disfavored because a motion for class certification is a more appropriate vehicle." *Wynn v. UPS*, 2024 WL 3560727, at *2 (N.D. Cal. July 26, 2024) (Freeman, J.) (cleaned up). A defendant therefore bears

the burden of demonstrating that "any questions of law are clear and not in dispute, and that under no set of circumstances could the" class be certified. *In re Future Motion, Inc. Prods. Liab. Litig.*, 2024 WL 3408224, at *12 (N.D. Cal. July 12, 2024) (Freeman, J.) (citation omitted). As such, motions to strike are rarely granted, even when entertained. *See, e.g.*, *Taylor v. Shutterfly, Inc.*, 2020 WL 1307043, at *4 (N.D. Cal. Mar. 19, 2020) (Freeman, J.).

**ARGUMENT**

**I.     Plaintiffs plausibly alleged that San Jose's Flock System effects a warrantless search in violation of the Fourth Amendment.**

Plaintiffs plausibly alleged that San Jose's Flock System effects an unlawful warrantless search. In *Carpenter*, the Supreme Court recognized that people have a reasonable expectation of privacy in their physical movements. To determine when new surveillance technologies contravene this expectation, the Court focused on three factors: the technology's capacity to reveal intimate details, make surveillance cheap and easy, and enable reconstruction of past movements. Defendants ignore this test and argue that the relevant standard is a quantitative threshold that only comprehensive surveillance can satisfy. But the Supreme Court rejected this approach just this term in *Chatrie* because it would create a host of impossible line-drawing problems.

Properly framed, Plaintiffs plausibly pleaded that San Jose's Flock System contravenes a reasonable expectation of privacy. They alleged that it can reveal intimate details by pervasively tracking people's habitual movements and by enabling police to deduce visits to sensitive locations. They alleged that it is far cheaper, easier, and more efficient than any analogous traditional police surveillance technique. And they alleged that its indiscriminate collection and storage of data enable police to reconstruct past movements. Defendants' Motion simply rehashes points *Carpenter* and *Chatrie* rejected, ignores factual allegations that are inconvenient for them, and frames its arguments around legal theories Plaintiffs are not asserting. And that falls far short of Defendants' burden to demonstrate that Plaintiffs failed to plead "sufficient facts" to state a plausible claim under a "cognizable legal theory." *See Adventist Health*, 169 F.4th at 1142. The Court should therefore deny the Motion and allow Plaintiffs' Fourth Amendment claim to proceed.

## A.   *Carpenter* laid the groundwork for a multifactor test to determine when new surveillance technologies contravene a reasonable expectation of privacy.

Defendants' arguments rest on a fundamental misunderstanding of Fourth Amendment doctrine regarding government surveillance. Their primary tack is to argue that *Carpenter* is a "narrow" "exception to the third-party doctrine" that only applies to "comprehensive location information." MTD at 11. As an initial matter, that mixes up two different analyses in *Carpenter*. The Court first concluded that government acquisition of cell-site location information contravened a reasonable expectation of privacy, *then* held that revealing those private movements to a third party did not waive the Fourth Amendment's protections. *See* 585 U.S. at 311, 313; *accord Chatrie*, 146 S. Ct. at 2206, 2212 (first addressing "the Government's front-line position" that no search occurred, then its "additional argument" that the third-party doctrine applied).[1] *Chatrie*, moreover, forecloses Defendants' argument that only fully comprehensive data can contravene a reasonable expectation of privacy. As explained below, *Carpenter* did not set a quantitative threshold, as Defendants claim, but instead "laid the foundation for a new, multifactor test to determine when government surveillance using digital technologies constitutes a search." *United States v. Chatrie*, 136 F.4th 100, 119 (4th Cir. 2025) (en banc) (Wynn, J., concurring in the judgment), *vacated*, 146 S. Ct. 2193.[2]

The Court's analysis opened by fixing "some basic guideposts." *Carpenter*, 585 U.S. at 305. "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,'" then "official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* at 304 (citation omitted). Because the Fourth Amendment "protects people, not places," these protections

---

[1] This case does not involve the third-party doctrine because Plaintiffs allege that San Jose is collecting its surveillance data directly, not accessing data Plaintiffs shared with a third party.

[2] The Supreme Court largely vindicated Judge Wynn's panel dissent and en banc concurrence.

can apply "even in an area accessible to the public." *Katz v. United States*, 389 U.S. 347, 351 (1967). That honors the "central aim of the Framers . . . 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). Consistent with that aim, the Fourth Amendment protects not only against the types of searches that existed at the Founding, but also preserves "that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 305 (cleaned up) (quoting *Kyllo*, 533 U.S. at 34).

These considerations led the *Carpenter* Court to "recognize[] that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Id.* at 310. That followed from *Jones*, where the Court held that tracking a car with a GPS for 28 days was a search. 565 U.S. at 401, 403-04. Five concurring justices agreed that GPS tracking violates a reasonable expectation of privacy. *See Chatrie*, 146 S. Ct. at 2206. Four of those justices reasoned "society's expectation has been that" the government "would not—and indeed, in the main, simply could not— secretly monitor and catalogue every single movement of an individual's car for a very long period." *Jones*, 565 U.S. at 430 (Alito, J., concurring). Justice Sotomayor, meanwhile, explained that in a different case she would reconsider "even short-term monitoring" that allowed police to track people "in the absence of any oversight from a coordinate branch." *Id.* at 415-16 (Sotomayor, J., concurring).

The upshot of the *Jones* concurrences, *Carpenter* later explained, is "that individuals have a reasonable expectation of privacy in the whole of their physical movements." 585 U.S. at 310. Defendants concede that much, but they try to limit *Carpenter*'s scope by ignoring key parts of the Court's analysis. Contrary to Defendants' claims, MTD at 12, "the *Carpenter* Court thought" that such an expectation of privacy followed from *Jones* "*even though the movements occurred in public.*" *Chatrie*, 146 S. Ct. at 2206 (emphasis added). Defendants make one more error still: they ignore the *contravention* part of the Court's analysis. That is, the portion of *Carpenter* holding that police conducted a search proceeded in two steps. *See United States v. Moore-Bush*, 36 F.4th 320, 340-41 (1st Cir. 2022) (en banc) (Barron, C.J., concurring). The Court first discerned an expectation of privacy in people's physical movements from *Jones*, and it then held that "[a]llowing government

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS & STRIKE CLASS ALLEGATIONS, NO. 5:26-CV-03181-BLF

9

access to cell-site records *contravenes* that expectation." *Carpenter*, 585 U.S. at 311 (emphasis added).

Contravention was the more difficult part because, unlike GPS, cell-site location information only sporadically places a cellphone in a large area that might encompass thousands of homes and businesses. *Compare id.* at 312, *with id.* at 336 (Kennedy, J., dissenting). Far from measuring this surveillance against some imagined "whole" of people's movements threshold, the Court instead focused on three features that differentiated cell-site location information from conventional police surveillance. *First*, "time-stamped [location] data provides an intimate window into a person's life, revealing not only his particular movements, but through them his" habits and associations. *Id.* at 311 (maj. op.). The lack of pinpoint precision did not change that conclusion because "inference [does not] insulate[] a search" and "the Government could, in combination with other information, deduce a detailed log of [someone's] movements" from cell-site location information. *Id.* at 312 (citation omitted). *Second*, using cell-site location information to deduce a person's movements was "remarkably easy, cheap, and efficient compared to traditional investigative tools," allowing the government to evade the resource constraints that have historically prevented abusive police surveillance. *Id.* at 311. And *third*, "the retrospective quality of the data" created the danger of a surveillance state because it meant "this newfound tracking capacity runs against everyone." *Id.* at 312.

"*Carpenter* established a multifactor approach to assessing reasonable expectations of privacy in digital information." *Chatrie*, 136 F.4th at 120 (Wynn, J., concurring). The Supreme Court then followed that approach again in *Chatrie* to hold that police contravened a reasonable expectation of privacy by obtaining "only two hours" of Google Location History data. 146 S. Ct. at 2215. En route to that conclusion, *Chatrie* considered "[e]verything *Carpenter* relied on." *Id.* at 2208. *First*, although two hours of data could not reveal intimate "patterns," "[e]ven short-term monitoring" may reveal visits to sensitive locations. *Id.* at 2209-10 (citation omitted). That the defendant did not visit any such locations was irrelevant because the Court focused on the technology's ultimate capabilities, not just "what it finds." *Id.* at 2211-12. *Second*, Location History enables police to surveil people "with no real effort" or cost, "at the 'click of a button.'" *Id.* at 2208

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS & STRIKE CLASS ALLEGATIONS, NO. 5:26-CV-03181-BLF

10

(citation omitted). And *third*, it "allows police officers to reconstruct retrospectively" even if they had no reason to suspect a person when the data were created. *Id.* (cleaned up).

*Chatrie* put to rest the notion that *Carpenter* set a quantitative threshold. After all, neither the data in *Carpenter* nor the data in *Chatrie* amounted to the "whole" of people's movements. The cell-site location information in *Carpenter* had substantial gaps and only placed a person in a general area. *See Carpenter*, 585 U.S. at 312; *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 342 (4th Cir. 2021) (en banc). The Location History data in *Chatrie* covered just two hours and only reflected the defendant's public movements while he was robbing a bank. *See Chatrie*, 146 S. Ct. at 2203, 2211-12. But the Supreme Court "ha[s] never understood Fourth Amendment protections as kicking in only once an intrusion 'goes too far.'" *Id.* at 2210 (citation omitted). To hold otherwise would "create a host of line-drawing questions" and leave courts wondering "[a]t what point, exactly, would a non-search become a search?" *Id.* at 2210 n.9. To avoid that result, *Chatrie* clarified that the contravention test is not "the result of any fixed set of rules," *id.* at 2205— like a quantity, density, duration, or comprehensiveness threshold.

Defendants are therefore wrong to argue that surveillance of people's movements only becomes a search when the data are comprehensive or reach some undefined quantitative threshold. *See* MTD at 11-12. To determine whether Plaintiffs pleaded a plausible claim, the Court should apply the same factors *Carpenter* and *Chatrie* used to distinguish high-tech dragnets from traditional police surveillance techniques: the capacity of the surveillance to reveal intimate details, to make surveillance cheap and easy, and to reconstruct past movements.

**B.     Plaintiffs plausibly alleged that San Jose's Flock System contravenes a reasonable expectation of privacy under the *Carpenter* factors.**

Charting the same course as *Carpenter* and *Chatrie*, Plaintiffs plausibly alleged that San Jose's Flock System upsets Founding-era expectations of privacy against police surveillance. It has the capacity to pervasively track where people drive, enabling police to infer patterns and visits to sensitive locations. It is far cheaper, easier, and more efficient than traditional police surveillance techniques. And San Jose's Flock data have a "retrospective quality" that allows police to travel back in time to reconstruct people's movements. Defendants fundamentally misunderstand

*Carpenter* and therefore did not address these factors in their motion. Even worse, Defendants largely ignore the factual allegations that make Plaintiffs' Fourth Amendment claim plausible. These omissions are fatal to their Motion.

> **i.    Factor 1: San Jose's Flock System has the capability to reveal intimate patterns and visits to sensitive locations.**

Under *Carpenter*'s first factor, Plaintiffs plausibly alleged that San Jose's Flock System has the capability to reveal intimate details. *Chatrie* clarified that surveillance of movements can reveal at least two types of "private matters": (i) "[r]epeated patterns . . . that individuals wish to, and reasonably expect to, keep to themselves," and (ii) visits to sensitive locations. *See* 146 S. Ct. at 2210. The key question is whether the surveillance has the *potential* to reveal such intimate information, not whether it is "likely to" do so. *Id.* "This is [a] general inquiry" that considers "the *general capabilities*" of the surveillance technology, not just what it revealed about any given person. *United States v. Smith*, 110 F.4th 817, 834 n.8 (5th Cir. 2024), *cert. denied,* 146 S. Ct. 356 (2025). After all, a "search is a search, even if it happens to disclose nothing" intimate. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987). Put differently, Plaintiffs were required to plausibly allege that San Jose's Flock System has the *ultimate potential* to reveal patterns or visits to sensitive locations, not that it had revealed or was "likely to" reveal the intimate details of their own lives. *See Chatrie*, 146 S. Ct. at 2210.

And that is what they did. Plaintiffs alleged that San Jose's Flock System has the capability to reveal both otherwise obscure patterns and visits to sensitive locations. Defendants ignore virtually all these allegations and thereby run afoul of the Rule 12(b)(6) standard. *See Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1165 (9th Cir. 2022).

Starting with the first category, Plaintiffs alleged facts showing that San Jose's long-term surveillance can reveal intimate patterns through habits and routines. San Jose's Flock System comprises 474 ALPRs that feed data into a centralized database shared among hundreds of government entities. Compl. ¶¶ 46, 55. These ALPRs are not distributed randomly throughout the city. To the contrary, the Complaint alleges that SJPD "strategically positioned" ALPRs along "busy corridors" and around intersections to maximize the amount of data they would capture. *Id.* ¶ 50.

That decision allows them to collect staggering amounts of data. In 2024 alone, San Jose's Flock System collected over 360 million photographs (some of which would contain multiple vehicles) that "reflected the movements of ordinary people going about their daily routines." *Id.* ¶ 47. The density and strategic placement of the ALPRs mean that "it can be equally revealing to note where cars were *not* captured," since that can exclude routes or even reveal where a person may have stopped. *Id.* ¶ 51. Officers can use Flock's automated software features to output a "Vehicle Journey Map" showing a person's travels, generate lists of cars frequently seen together, or identify vehicles that visited a set of locations of interest. *Id.* ¶¶ 26, 28, 34-35. And the surveillance far exceeds the seven days the Supreme Court held sufficient in *Carpenter*. *See Chatrie*, 146 S. Ct. at 2209 & n.8. Not only does San Jose's Flock System collect data in 30-day increments, but, unlike a traditional surveillance operation, this citywide surveillance will *never* end. Compl. ¶¶ 45, 55, 101.

Those allegations are enough to show that San Jose's Flock System has the capability to reveal intimate patterns. As the en banc Fourth Circuit explained, "people's movements are so unique and habitual" that "just a few random points of an individual's movements" can uniquely identify them. *Beautiful Struggle*, 2 F.4th at 343-44 & nn.10-11. Long-term location tracking therefore has the inherent ability to "enable[] deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble,' which 'reveal[s] more about a person than does any individual trip viewed in isolation.'" *Id.* at 342 (quoting *United States v. Maynard*, 615 F.3d 544, 562-63 (D.C. Cir. 2010), *aff'd sub nom. Jones*, 565 U.S. 400); *see also* Ilse M. Harms et al., *The Role of Route Familiarity in Traffic Participants' Behaviour and Transport Psychology Research: A Systematic Review*, 9 Transp. Rsch. Interdisc. Persps., Mar. 2021, at § 1.1, https://bit.ly/4trUGGQ ("[P]eople repeatedly visit the same areas, using the same routes and the same transport modes. Because of this routine behaviour, human patterns of mobility are highly predictable.").

Standing alone, these allegations are sufficient to render plausible the inference that San Jose's Flock System can reveal intimate patterns. But Plaintiffs went a step further. They generated a representative sample of over 50,000 routes to assess the overall capabilities of San Jose's Flock System. Compl. ¶ 52. That analysis demonstrated that San Jose's Flock System has the capability to capture the vast majority of routes, with as many as fifteen captures along a single route. *Id.* With

other tools at their disposal, the Complaint alleges, police can often fill in whatever gaps remain by searching for information about a person in public records and other police databases. *Id.* ¶ 53; *cf. Beautiful Struggle*, 2 F.4th at 344 (officers can use "context," "publicly available information[,] and, even more valuably, their own data systems" to "deduce identity" and pick up the trail when "the tracking of a car is interrupted"). And in any event, given how habitual people's movements are, "it is near certain that" the Flock System will enable police to deduce "a large share of [people's] repeated, habitual trips." Compl. ¶ 54. With "data on dozens of repeat trips," police can "identify patterns, infer where people go often, deduce associations, and even spot notable departures from a routine." *Id.*; *see Beautiful Struggle*, 2 F.4th at 342 & n.8.

Moving to the next category of intimate details, Plaintiffs plausibly alleged that San Jose's Flock System has the capacity to reveal visits to sensitive locations. *Chatrie* held "'[e]ven short-term monitoring' of a person's physical movements" can effect a Fourth Amendment search by revealing such trips. 146 S. Ct. at 2210 (citation omitted). Using San Jose's Flock System, officers could deduce trips to virtually all the sensitive locations *Chatrie* identified and more. *Compare id.* at 2210-11 & n.10 (noting that short-term monitoring can reveal visits to, among other places, healthcare facilities, "the criminal defense attorney," "a political rally," a "church," or "a private residence"), *with* Compl. ¶ 48 ("These cameras and others capture people on their way to work, worship, loved ones, medical care, protests, and countless other places."). More concretely, the Complaint alleges specific configurations of ALPRs around immigration lawyers' offices, healthcare facilities, and places of worship that can reveal visits to all of those places. Compl. ¶ 48 & figs. 4-7. And though *Chatrie* does not require it, Plaintiffs plausibly alleged that San Jose's Flock System can reveal their own visits to sensitive locations. *E.g., id.* ¶ 79 (alleging that San Jose's Flock System has collected and stored data about Tony's movements as he drove to "attend protests, monitor ICE activity," and "go to healthcare appointments"). Because SJPD placed cameras in residential areas, it can even use its Flock System to discern when people are in their homes, *cf. Chatrie*, 146 S. Ct. at 2211-12—including when Plaintiffs are home, Compl. ¶¶ 78, 89, 97.

Far from arguing that these factual allegations (which must be accepted as true) are implausible, Defendants simply ignore them. So they fail to demonstrate that San Jose's Flock

System lacks the capacity to reveal intimate details through patterns or visits to sensitive locations, as alleged in the Complaint. Read charitably, Defendants' Motion seems to allude to two potential arguments they could press in reply.

*First*, Defendants imply that other courts have held that the use of ALPRs *categorically* cannot be a search because they supposedly collect too little information. MTD at 7, 11-16. The fundamental problem with these cases, however, is that they relied on the "volume of information" to hold that ALPRs do not effect a search. *E.g.*, *United States v. Rubin*, 556 F. Supp. 3d 1123, 1129-30 (N.D. Cal. 2021). But *Chatrie* now forecloses that approach. *See Chatrie*, 146 S. Ct. at 2210-11 & n.9. Even taken on their own terms, these ALPR cases cannot bear the weight Defendants place on them. They involved much more limited systems than San Jose's. *See, e.g.*, *United States v. Porter*, 170 F.4th 381, 384 (5th Cir. 2026) ("no more than ten LPR cameras"); *Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 709 (N.D. Ill. 2025) (around 300 ALPRs on "expressways" across all of Cook County); *United States v. Martin*, 753 F. Supp. 3d 454, 458 n.4 (E.D. Va. 2024) (66 cameras in Richmond at the time of the search); *Rubin*, 556 F. Supp. 3d at 1129-30 & n.2 (N.D. Cal. 2021) (2018 technology and a small number of datapoints across an unknown time period). Many even acknowledged that more extensive ALPR systems likely would amount to a Fourth Amendment search. *See, e.g.*, *United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Bea, J., concurring); *Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492, 498, 513-14 n.17 (E.D. Va. 2026); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1114 (N.D. Ohio 2025). And finally, Ninth Circuit precedent precludes Defendants' reliance on these cases to establish *facts* about ALPRs or San Jose's Flock System that are not alleged in the Complaint. *California ex rel. RoNo, LLC v. Altus Fin. S.A.*, 344 F.3d 920, 931 (9th Cir. 2003). That would be especially inappropriate on a Rule 12(b)(6) motion given that most of these cases were decided on motion-to-suppress or summary-judgment records. *See, e.g.*, *Schmidt*, 819 F. Supp. 3d at 496 (summary judgment); *Martin*, 753 F. Supp. 3d at 456-57 (suppression hearing with live testimony and exhibits).

*Second*, Defendants argue that their Flock System cannot effect a search because it does not "'faithfully follow[]' a person from place to place" and "into . . . private spaces." MTD at 12, 17. That assertion just recycles "the proposition that 'inference insulates a search.'" *Carpenter*, 585 U.S.

at 312 (citation omitted). The cell-site location information in *Carpenter* was generated only at the start and end of calls, and it only placed someone in a large sector that could contain thousands of homes and businesses. *See id.* at 302; *id.* at 336 (Kennedy, J., dissenting). But the gaps and imprecision did not matter because "the Government could, in combination with other information, deduce a detailed log of [a person's] movements" using cell-site location information. *Id.* at 312 (maj. op.). Inferring a person's "ultimate destination[]," MTD at 13, from ALPR data is no different from inferring where a person went in a miles-wide area between sporadic tower pings or after parking a car with a GPS device attached to it. *See Beautiful Struggle*, 2 F.4th at 342-43. "From [ALPR] data, a trained officer" can "draw[] inferences and make[] deductions . . . that might well elude an untrained person." *See United States v. Cortez*, 449 U.S. 411, 418 (1981). And although ALPRs do not literally follow people into private spaces, the "insight[]" that "[e]ven short-term monitoring" can track people to sensitive locations came from *Jones*, where all "the movements occurred in public." *Chatrie*, 146 S. Ct. at 2206, 2210. Limiting that insight to "through-the-wall surveillance" would draw irrational distinctions between surveillance technologies that yield functionally equivalent deductions. *See Kyllo*, 533 U.S. at 35-36.

The Complaint plausibly alleges that San Jose's Flock System can reveal intimate details through patterns and visits to sensitive locations. Defendants largely ignore these allegations and fail to show otherwise. Even reading their arguments charitably to address this factor, they simply rehash arguments *Carpenter* and *Chatrie* rejected.

  ii. **Factor 2: San Jose's Flock System is cheap, easy, and efficient compared to traditional police surveillance techniques.**

The second *Carpenter* factor asks whether the surveillance tool is "remarkably easy, cheap, and efficient compared to traditional investigative tools." *Carpenter*, 585 U.S. at 311. *Chatrie*, too, assessed this factor: police could use location history to surveil people "with no real effort," "again at the 'click of a button.'" 146 S. Ct. at 2208 (citation omitted). The ease, low cost, and efficiency of the surveillance are relevant because, like the other factors, they reflect historical expectations of police surveillance capacity. "Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and

therefore rarely undertaken.'" *Carpenter*, 585 U.S. at 310 (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring)). Traditional surveillance is difficult to scale up because it runs up against "limited police resources and community hostility." *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). Low-cost surveillance technologies that evade those historical constraints "could lead to more surveillance and less accountability." *Chatrie*, 136 F.4th at 124 (Wynn, J., concurring).

Plaintiffs plausibly alleged that San Jose's Flock System is remarkably cheap, easy, and efficient compared to traditional investigative tools. The closest traditional analogue for San Jose's Flock System might be officers stationed at around 500 locations diligently recording vehicle details or snapping photographs, to be entered into a central database later. Setting aside how fanciful that analogy is for a moment, *see Jones*, 565 U.S. at 420 n.3 (Alito, J., concurring), the cost of that program would be astronomical, requiring hundreds of officers working around the clock. But, as alleged in the Complaint, San Jose's Flock System accomplishes the same thing at a much lower cost. Each ALPR costs just $2,500 per year—far less than it would cost to have officers try to perform the same functions and even "less expensive than traditional ALPRs, which were too costly for most police departments to deploy in large numbers." Compl. ¶¶ 31, 33, 46 & n.9. That has enabled SJPD to blanket the entire city in surveillance at a much lower cost.

The surveillance is not merely cheap but easy and efficient. That is why analogies to traditional police surveillance sound so fanciful: "Unlike a police officer posted at an intersection, the cameras see and remember everything. Day or night, they photograph every passing car [even at high speeds] and use AI to analyze the images." *Id.* ¶¶ 2, 22. In 2024, they collected 360 million photographs (each of which might contain multiple cars), *id.* ¶ 47, a feat ordinary officers posted at the same locations would never be able to accomplish. Using AI, they generate a "Vehicle Fingerprint" that enables SJPD officers to search using a full or partial license plate, a car's distinctive features, or a freeform description of the car they want to find. *Id.* ¶¶ 32-35, 66-67. San Jose's Flock System automates not just the collection and searching of information, but even the analysis. "With just the click of a button," *Carpenter*, 585 U.S. at 311, SJPD officers can—and *do*—output "Vehicle Journey Maps," identify cars frequently seen together, and generate lists of cars that visited a set of locations of interest, Compl. ¶¶ 4, 34-35, 67. "The sort of tracking that would have

taken days of effort, multiple officers, and significant resources a decade ago now happens automatically." *Id.* ¶ 4.

Plaintiffs plausibly alleged that San Jose's Flock System is far cheaper, easier, and more efficient than conventional police surveillance.

### iii.    Factor 3: San Jose's Flock data have a retrospective quality that means this newfound tracking capacity runs against everyone.

The third *Carpenter* factor asks whether a surveillance technology has a "retrospective quality" that means "this newfound tracking capacity runs against everyone." *Carpenter*, 585 U.S. at 312. At its core, the Fourth Amendment is a ban on indiscriminate, suspicionless searches. *See Payton v. New York*, 445 U.S. 573, 583-84 & n.21 (1980); *Bourgeois v. Peters*, 387 F.3d 1303, 1311-13 (11th Cir. 2004). But indiscriminate surveillance technologies that "allow[] police officers to reconstruct retrospectively" lead to the type of "too permeating police surveillance" the Fourth Amendment proscribes. *Chatrie*, 146 S. Ct. at 2207, 2210 (cleaned up and citations omitted). "[P]olice need not even know in advance whether they want to follow a particular individual" because retrospective data let them "call upon the results of [their] surveillance without regard to the constraints of the Fourth Amendment." *Carpenter*, 585 U.S. at 312.

Plaintiffs plausibly alleged that San Jose's Flock data have a retrospective quality that enables police to travel back in time to reconstruct a person's movements even when they had no reason to suspect that person in advance. San Jose's ALPRs "photograph every passing car," analyze the images with AI, and store that information "in a centralized database." Compl. ¶ 2; *see also id.* ¶¶ 3, 22, 28, 31-32, 36, 55. This happens "without a warrant, probable cause, or even a hunch that all of these drivers are engaged in wrongdoing." *Id.* ¶ 1; *see id.* ¶¶ 124-28. Plaintiffs thus alleged that the more than 360 million photographs San Jose's Flock System collected in 2024 almost entirely "reflected the movements of ordinary people going about their daily routines." *Id.* ¶¶ 47-48. That includes Tony, Scott, and Colin, who are all law-abiding citizens captured every day as they drive to protests, healthcare appointments, friends and loved ones, and countless other places. *Id.* ¶¶ 71-112. Yet each datapoint San Jose's Flock System generates about Plaintiffs' movements—and everyone else's—gets stored in a massive database just in case police later decide that they want

to travel back in time to reconstruct a person's movements. *Id.* ¶¶ 101-12, 122-28. The indiscriminate, dragnet nature of San Jose's Flock System is one of its most problematic aspects, hearkening back to "general warrants" that authorized "unrestrained" invasions of personal privacy and security. *See Carpenter*, 585 U.S. at 303-04, 312; *see also* Compl. ¶ 9; *cf. United States v. Spurlock*, 778 F. Supp. 3d 1136, 1143-44 (D. Nev. 2025) (noting the "potential intrusiveness" of a "tower dump" that collected "location data on over 1600 people who neither consented nor were likely even aware that their location was being tracked").

Accordingly, Plaintiffs plausibly alleged that San Jose's Flock System is retrospective and indiscriminate, as in *Carpenter* and *Chatrie*.

\*          \*          \*

Plaintiffs alleged that San Jose's Flock System has the capability to reveal intimate details, that it is far cheaper and easier than traditional police surveillance, and that it enables police to reconstruct past movements because it stores data indiscriminately. Those factual allegations are sufficient to plausibly state a claim under a "cognizable legal theory"—the one recognized in *Carpenter* and reaffirmed in *Chatrie*. Applying the same factors those cases assessed and accepting the well-pleaded allegations as true, Plaintiffs have plausibly alleged that San Jose's Flock System contravenes people's reasonable expectation of privacy in their physical movements and thereby effects an unlawful warrantless search.

**C.      Supreme Court precedent forecloses Defendants' argument that no search happens absent human review.**

Plaintiffs pleaded a plausible claim under a cognizable legal theory. But most of Defendants' Motion takes aim at a different legal theory, arguing that Plaintiffs have no reasonable expectation of privacy in isolated photographs of their cars or in their movements from one place to another. MTD at 8-10. Defendants' rationale seems to be that because Plaintiffs do not allege that an officer "queried" their data, they can only challenge the collection of individual photographs, not the "aggregation" of data in Defendants' centralized database. MTD at 8-10, 13. Why that is, Defendants never clearly explain. Whatever the rationale for this argument, precedent forecloses it multiple times over.

The Supreme Court rejected the myopic view that a search requires human review in *Kyllo*, 533 U.S. 27. The dissent contended that police use of a thermal imager was not a search because the crude images revealed nothing until an officer reviewed them and "inferred" interior details. *See id.* at 44, 52 (Stevens, J., dissenting). But the majority rejected the "novel proposition that inference insulates a search." *Id.* at 36. The "unlawful thermal-imaging *measurement*" was a search even though the data required human "analysis (*i.e.*, the making of inferences)" "before anything inside the house could be known." *Id.* at 36-37 & n.4 (emphasis added). Likewise, in *Chatrie*, the Supreme Court focused not on what information the police "actually acquired," but on what was in the "all-encompassing database" they "can access." 146 S. Ct. at 2210.

The upshot is that there is no "'automation exception' to the Fourth Amendment" that shields surveillance programs that collect data without direct human involvement. Laura K. Donohue, *Bulk Metadata Collection: Statutory and Constitutional Considerations*, 37 Harv. J.L. & Pub. Pol'y 757, 895 (2014). Otherwise, police could set up myriad dragnet surveillance programs without judicial oversight. They could require every home-security camera to automatically save footage to a government database, and they could automatically download CSLI in bulk every day. *See id.* at 895-96. Removing automated surveillance from the ambit of the Fourth Amendment overlooks that the collection of information is itself an invasion of privacy "from the standpoint of the citizen whose privacy is at stake." *United States v. Karo*, 468 U.S. 705, 735 (1984) (Stevens, J., concurring in part and dissenting in part). Even if no one sees the data, "[a]wareness that the government may be watching chills associational and expressive freedoms." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring). More colorfully, a "bathtub is a less private area when the plumber is present even if his back is turned." *Kyllo*, 533 U.S. at 39 (quoting *Karo*, 468 U.S. at 735 (Stevens, J., concurring in part and dissenting in part)). This Court should not be the first to recognize an "automation exception" to the Fourth Amendment—especially at a time when the retrieval and analysis of information are themselves increasingly automated through the use of AI, as alleged in the Complaint. *See* Compl. ¶¶ 1-3, 32, 34-35, 44, 67, 103, 105, 107.

This case is not about 474 "conventional" cameras operating in silos; it is about an advanced regional surveillance system that aggregates many millions of datapoints on people's movements in

a centralized government database. *See id.* ¶¶ 1-4. Framing the case in this way—based on what Plaintiffs actually alleged—distinguishes the cases Defendants cite. MTD at 8-10. The "rudimentary" beeper in *United States v. Knotts*, 460 U.S. 276 (1983), did not "allow[] remote monitoring" and thus "did not turn [an ordinary] tail into a search" just because it allowed police to follow a suspect's single journey more effectively, *Chatrie*, 146 S. Ct. at 2211; *see Carpenter*, 585 U.S. at 306-07. The ordinance in *Sanchez v. Los Angeles Department of Transportation* required companies that leased e-scooters for individual rides to share anonymized trip data for transit planning purposes. 39 F.4th 548, 559-61 (9th Cir. 2022). The Ninth Circuit held that was not a search because (unlike cars in San Jose, *see* Compl. ¶ 40) shared e-scooters are not an "indispensable" form of transportation, and the anonymous nature of the data and regulatory purpose meant the data could only reveal "a single ride," *see Sanchez*, 39 F.4th at 559-61. But there is a world of difference between gathering anonymous data on a *single* trip and aggregating non-anonymous data on countless trips that can easily be linked together to reveal patterns and visits to sensitive locations. *Cf. United States v. Moalin*, 973 F.3d 977, 990-92 (9th Cir. 2020) (distinguishing the limited use of a pen register from long-term bulk telephony metadata collection).

Even farther afield are the cases Defendants cite holding that people have a reduced expectation of privacy in their cars, like *New York v. Class*, 475 U.S. 106 (1986), or allowing police to use conventional surveillance technologies without a warrant, like *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999), *abrogated by Jones*, 565 U.S. 400; *see* MTD at 8-10. "[P]eople are not shorn of all Fourth Amendment protection when they step from their homes . . . . into their automobiles," where "many find a greater sense of security and privacy" than in other forms of travel. *Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979). And this case is not about scattered and isolated observations of cars in public any more than *Carpenter* was "about 'using a phone' or a person's movement at a particular time." 585 U.S. at 315. That conventional surveillance techniques like human observation and pole cameras can sometimes capture fragments of the details San Jose's Flock System records "does not mean th[is] . . . citywide prolonged surveillance campaign must be permissible as well." *Beautiful Struggle*, 2 F.4th at 346; *see Kyllo*, 533 U.S. at 35 n.2. Nor does it make San Jose's Flock System a "conventional" surveillance tool. When *Carpenter* referenced

"conventional surveillance techniques and tools, such as security cameras," MTD at 11, it was "referring to the familiar 'tactic[]'" of police seeking "footage from third parties['] . . . security cameras," *Moore-Bush*, 36 F.4th at 352 (Barron, C.J., concurring) (first alteration in original). In other words, *Carpenter* distinguished "conventional-discrete" surveillance techniques from "unconventional-aggregative" technologies. *Id.* at 344. And the Complaint more than plausibly alleges that San Jose's Flock System falls on the "unconventional-aggregative" side of the line. *See* Compl. ¶¶ 29-38, 45-47. Indeed, it alleges that it is even more powerful than "[t]raditional LPR systems." *Id.* ¶¶ 29, 32-33 (alteration in original).

Last, to the extent that Defendants contend that Plaintiffs lack standing because they did not allege that an officer "queried" their data, that too is foreclosed by precedent. Every U.S. Court of Appeals to address the issue, including the Ninth Circuit, has held that a plaintiff need only show the government has collected and stored their information, not that a human will actually review it. *See Sanchez*, 39 F.4th at 554; *accord Wikimedia Found. v. NSA*, 857 F.3d 193, 209-11 (4th Cir. 2017); *Schuchardt v. President of the U.S.*, 839 F.3d 336, 346, 349-50 (3d Cir. 2016); *ACLU v. Clapper*, 785 F.3d 787, 801-02 (2d Cir. 2015). As explained above, the warrantless collection of data is a Fourth Amendment (and thus Article III) injury regardless of whether a human "queries" the information and infers intimate details. *See Kyllo*, 533 U.S. at 36-37 & n.4; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("[A] violation of the Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion." (citation omitted)). Even so, every time an officer searches Defendants' data—whether using a full or partial license plate or other vehicle features—Flock's software necessarily "search[es] through [Defendants'] *entire* database." *See Smith*, 110 F.4th at 837. Under any definition, Plaintiffs have Article III standing.

Despite Defendants' preference that this case be about isolated photographs of Plaintiffs' license plates at public places, that is not what Plaintiffs alleged in their Complaint. This Court should reject Defendants' effort to shoehorn Plaintiffs into that theory. Plaintiffs alleged that Defendants' citywide surveillance system has aggregated data about their movements without a warrant for years. They have every right to challenge that conduct, whether or not an officer ever "queried" their data.

**II.    There is no basis to dismiss either SJPD or Chief Joseph in his official capacity.**

SJPD and Chief Joseph are proper parties, and Defendants have failed to show otherwise.

Defendants first argue that SJPD should be dismissed because it "is not a separate legal entity capable of being sued." MTD at 21. Under Rule 17(b), though, state law decides whether an entity has the capacity to be sued, and the Ninth Circuit has held that the "[San Jose] Police Department" is a "public entity under" California law that "may be sued in Federal court." *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 605 (9th Cir. 1986); *see also Streit v. County of Los Angeles*, 236 F.3d 552, 565-66 (9th Cir. 2001) (declining to reconsider *Shaw*). Defendants neither mention nor distinguish this precedent, which forecloses their argument for dismissing SJPD.

Next, Defendants argue the official capacity claims against Chief Joseph are redundant. But the case they cite provides only that a district court "*may* dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (emphasis added). "This rule stems from the idea that an official capacity suit against both an officer and a municipality may be 'possibly confusing to the jury' because an officer in her official capacity is functionally the municipality." *Sinclair v. San Jose Unified Sch. Dist. Bd.*, 2021 WL 2948871, at *5 (N.D. Cal. July 13, 2021) (Koh, J.). Because Plaintiffs seek only equitable relief and nominal damages, Compl. pp. 33-34, this case will be tried to the Court, *see Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir. 2010); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102 (N.D. Cal. 2007). So "there is no risk of . . . jury confusi[on]" and no reason to dismiss Chief Joseph. *See Sinclair*, 2021 WL 2948871, at *5.

Accordingly, the Court should not dismiss SJPD or Chief Joseph.

**III.    Defendants have not met their heavy burden to justify striking the class allegations.**

Defendants argue the Court should strike the class allegations because the class includes future members and because Plaintiffs do not allege an officer "queried" their data. These arguments are meritless and, in any event, should be raised at class certification, not in a motion to strike.

Their first argument is that the class is "fatally overbroad and unascertainable" because it includes future class members. MTD at 22-23. But that argument rests on a fundamental misunderstanding of the difference between Rule 23(b)(2) and Rule 23(b)(3) classes. Rule 23(b)(2)

was "designed . . . specifically" for classes that are "unascertainable or amorphous." 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:26, Westlaw CLASSACT (6th ed. June 2026 update). An "ascertainability requirement" would therefore "serve[] little purpose" and "does not apply to Rule 23(b)(2) actions" like this one. *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 597 (N.D. Cal. 2015) (Koh, J.). That means "[t]he inclusion of future class members in a class is not itself unusual or objectionable." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (citation omitted); *see, e.g.*, *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020) (Freeman, J.) (certifying class with future members). Plaintiffs seek to certify a class pursuant to Rule 23(b)(2), so their inclusion of future members is not an obstacle to certification, much less a basis to strike their class allegations at the pleading stage.

Defendants then argue the Court should strike the class allegations because Plaintiffs "do not allege—and cannot allege—that their data was ever actually queried." MTD at 23. As explained above, however, that makes no difference on standing or the merits. *See* Section I(C) above. Plaintiffs have standing because San Jose's Flock System collected and aggregated data about their movements. The class is limited to drivers who are similarly situated, *see* Compl. ¶ 114, so all of the members of the class share the same *claim*, and certification under Rule 23(b)(2) "does not require a finding that all members of the class have suffered identical injuries," *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). The answer to the fundamental Fourth Amendment question must be the same for the entire class: "The surveillance must be either a search or not regardless." *Chatrie*, 146 S. Ct. at 2212. That is a paradigmatic common question. And in any event, Defendants' critiques of *some* of the alleged common questions do not justify striking the class allegations since Defendants "do[] not challenge the other . . . common questions identified by Plaintiff[s]," *Chinitz*, 2020 WL 7391299, at *9.

Defendants' arguments for striking the class allegations are meritless. At the very least, these "argument[s are] not as clear-cut as [Defendants] would wish and thus [are] more appropriately addressed at class certification." *Taylor*, 2020 WL 1307043, at *4. They have therefore completely failed to justify the extraordinary remedy of striking the class allegations.

**CONCLUSION**

For these reasons, the Court should deny Defendants' motion.

Respectfully submitted,

Dated: August 10, 2026

Anna M. Barvir (Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, California 90802
(562) 216-4444
abarvir@michellawyers.com

/s/ Michael B. Soyfer
Michael B. Soyfer (pro hac vice)
Robert Frommer (pro hac vice)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
msoyfer@ij.org
rfrommer@ij.org

Daniel Woislaw (pro hac vice)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, Texas 78701
(512) 480-5936
dwoislaw@ij.org

*Attorneys for Plaintiffs*