2026 WL 2656384
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

USA, Plaintiff,
v.
RILEY THOMAS, Defendant.

Case No. 5:25-cr-00095-PCP-1
|
Filed 09/09/2026

**Attorneys and Law Firms**

Taylor Lord, Assistant U.S. Attorney, DOJ-United States Attorney's Office, San Jose, CA, for Plaintiff.

Dejan Gantar, Public Defender, Office of the Federal Public Defender, San Jose, CA, for Defendant.

**ORDER DENYING MOTION TO DISMISS, GRANTING REQUEST FOR EVIDENTIARY HEARING, AND GRANTING IN PART MOTION TO UNSEAL AND COMPEL DISCLOSURE**

P. Casey Pitts United States District Judge

***1** Defendant Riley Thomas is charged with possession of fentanyl with an intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). The charge is based in part upon a search conducted by a Santa Cruz County Sherriff's Office (SCCSO) detective on September 18, 2024. Thomas now moves to dismiss the indictment and suppress all evidence obtained by the SCCSO, or in the alternative for an evidentiary hearing. The Government separately moves to unseal all ex parte subpoenas approved by the magistrate judge in this case and to compel disclosure for all materials received in response to those subpoenas. For the following reasons, the Court denies the motion to dismiss, grants the request for an evidentiary hearing, and orders Thomas to provide the government with copies of all documents received in response to the ex parte subpoena. [1] The Court will address the scheduling of the evidentiary hearing during the upcoming status conference set for September 23, 2026, at 10:00 am.

1 The parties' pending motions to seal, Dkts. 59, 63, 66, 70, and 77, are granted. *See* Crim. L.R. 56-1.

## BACKGROUND

Although the case before the Court involves federal charges against Thomas, the investigation on which those charges are based was conducted almost entirely by the SCCSO. For that reason, the Court focuses on the state investigation.

### A. The Initial Warrant

Detective Angelo Claussen became aware of Riley Thomas on September 11, 2024, on his first day working as a detective for the SSCSO. Claussen was assigned to the Fentanyl Crisis Response Team, where he was instructed to "follow up" on an old case. After receiving a warrant, Claussen reviewed an arrestee's cell phone. There, he found a series of texts from a phone number ending in 7779. Claussen looked up the number on a law enforcement database and connected the number with defendant Riley Thomas. The texts from that number—spanning from March through June 2024—included offers to sell fentanyl, isotonitazene, and methamphetamine. One message read: "I used to move the most weight in town bro ask around I know how shit is."

Another mentions that Thomas spent the night in Oakland with his "hundo." At one point, Thomas asked the recipient if they will consider working for him, as he only has "six people working for him at a time." In his application for a search warrant, Claussen wrote that, "[b]ased on [his] training and experience," he knew "individuals will purchase fentanyl from San Francisco and Oakland," and that "Hundo" was "slang for Hondurans." Claussen then wrote that "[t]hrough speaking with drug users and dealers they have expressed the Hondurans are the ones they purchase fentanyl from in the San Francisco and Oakland areas." Claussen then wrote that the text messages show that "Thomas is actively selling/transporting" drugs. Claussen requested and received a search warrant tracking the real time location data of the cell phone ending in 7779 for thirty days.

**B. The September 18 Traffic Stop, Search, and Subsequent Arraignment**

***2** Using the information generated from the warrant, Claussen tracked Thomas's cell phone to "the City of Oakland" and an "area that contained a Flock camera." Claussen "reviewed photos from the Flock camera at that time and learned the vehicle being driven at the time of the ping location data was a white, 2023 Toyota Camry" registered to Thomas's girlfriend. "Per Flock cameras, the Camry returned to the City of Santa Cruz." Claussen used cell phone tower data to track Thomas to an apartment complex, then identified the unit he was in based on where the Camry was parked. Later that afternoon, Claussen "observed Thomas driving the white Toyota Camry" in violation of CVC 26708(a)(1) (tinted windows) and CVC 22354 (driving over the speed limit). Claussen stopped the car. Claussen approached the driver's window and asked Thomas for identification, which Thomas did not have. Claussen asked another officer to "get [Thomas's] info" and then walked back to his cruiser to get "Goose," a K9 drug dog. As the other officer spoke to Thomas, Claussen deployed Goose, telling him to "find it." Within seven seconds, Goose alerted to the rear trunk, and Claussen conducted a search. The detective recovered 2 grams of a white powder, a scale with white powder residue on it, and 2 grams of a white crystal substance. Claussen then sought and received a search warrant for Thomas's apartment. There, detectives found more drugs and paraphernalia. Thomas was arrested.

On September 20, 2024, Thomas was charged in Santa Cruz Superior Court with felony importation and possession with the intent to sell of fentanyl, felony possession of a firearm by a felon, and felony possession of methamphetamine with intent to sell. He was appointed counsel at the arraignment and released with several conditions, including submitting his "person, vehicle, [and] residence ... to search and seizure at any time ... by a peace officer, with or without a warrant."

**C. The November 5, 2024, Search and Seizure**

Thomas was released immediately after his arraignment and returned home. On November 5th, 2024, he was stopped by Claussen and another officer while walking his dogs and was searched pursuant to the terms of his release. Despite finding nothing on Thomas's person, the officers also searched his apartment. There, they found nearly thirty-three grams of suspected fentanyl and four grams of methamphetamine. Thomas was arrested again, handcuffed, and transported to the Santa Cruz County Sherriff's headquarters in a police car. Once there, Thomas's handcuffs were removed, and the officers turned off their body cameras. Thomas was then interviewed without his attorney present. At no point was Thomas informed of his *Miranda* rights.

On November 8, 2024, Thomas was charged with possession of fentanyl for sale based on evidence from the November 5, 2024, search. Thomas and Claussen communicated by text from November 5 through November 19, shortly before he was arrested for a third time.

**D. The November 19, 2024, Arraignment, Search, and Seizure**

On November 19, Thomas appeared in court to be arraigned for his November 5th arrest, and for proceedings stemming from his September 18th arrest. He was appointed counsel and released. As he and his girlfriend drove away from the courthouse, Claussen and two other officers stopped them and ordered Thomas out of the car. Thomas was informed that the officers were doing a "probation compliance check" and that the officers were "going to search" him. Claussen deployed Goose, who alerted to drugs inside the car. The officers searched the car but did not find any drugs. Officers then searched Thomas's apartment, where they recovered more drugs. Thomas was then arrested a third time.

* * *

On March 25, 2025, the DOJ charged Thomas with possession with intent to distribute fentanyl based on the evidence obtained from the September 18, 2024, traffic stop and apartment search. The government avers that it "does not intend to offer evidence regarding [the November 5th and 19th incidents] in this case unless needed to rebut arguments or evidence presented by the defense."

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To that end, it "is a vital safeguard of the right of the citizen to be free from unreasonable government intrusion into any area in which he has a reasonable expectation of privacy. *Winston v. Lee*, 470 U.S. 753, 767 (1985). A state must have a reasonable justification—or probable cause—for intruding on a protected privacy interest. *United States v. Ortiz*, 422 U.S. 891, 896 (1975). The burden of establishing probable cause lies with the government. *Cervantes v. United States*, 263 F.2d 800, 805 (9th Cir. 1959). If the government fails to do so, evidence obtained in violation of the Fourth Amendment must be excluded at trial. *United States v. Rosales-Aguilar*, 818 F.3d 965, 969 (9th Cir. 2016) (citing *Terry v. Ohio*, 392 U.S. 1, 12 (1968)).

***3** A criminal defendant must raise a motion to suppress before trial. Fed. R. Crim. P. 12(b)(3)(C). If the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist, a defendant may be entitled to an evidentiary hearing. *United States v. Ramirez-Garcia*, 269 F.3d 945, 947 (9th Cir. 2001). Whether to hold an evidentiary hearing is within the discretion of the district court. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

A criminal defendant may move to dismiss an indictment without a trial on the merits. Fed. R. Crim. P. 12(b)(1). An indictment may be dismissed for government misconduct either because of a serious due process-violation or because dismissal is warranted under the court's supervisory powers. *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (citing *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). To be dismissed for a due-process violation, the case must be tainted with government conduct "so grossly shocking and outrageous as to violate the universal sense of justice." *Id.* A court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (citation omitted). "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers*, 751 F.2d 1074, 1076 (9th Cir. 1985).

## ANALYSIS

Thomas moves to dismiss the indictment and suppress any evidence obtained from the searches. The government separately moves to unseal and compel disclosure of an ex parte request for a subpoena procured by Thomas's counsel, any other such ex parte subpoenas, and whatever discovery was obtained as a result of the subpoenas.

### I. Motion to Suppress

Thomas moves to suppress the following: (1) the evidentiary fruits of the location tracking warrant issued on September 17; (2) the evidentiary fruits of Claussen's search of the Flock database; (3) the evidentiary fruits of the search of Thomas's vehicle on September 18; (4) the evidentiary fruits of the September 18 apartment search; (5) the evidentiary fruits of the November 5 and 19 apartment searches; and (6) the evidence recovered from Thomas's four electronic devices. Because the lawfulness of

both the Flock search and the vehicle search cannot be resolved on the evidence before the Court, it will hold an evidentiary hearing on those matters. As suppression of the evidence in categories 4, 5, and 6 could flow from a conclusion that either the Flock search or the vehicle search was unlawful, the Court will not address those categories until it has determined, after the evidentiary hearing, whether the evidence in categories 2 or 3 must be suppressed.

### 1. Location-Tracking Warrant

A warrant must be supported by probable cause. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). Probable cause exists where there is a substantial chance of criminal activity. *Id.* at 243, n.13. It is determined on the basis of the totality of the circumstances known to the officers at the time of the search, *id.* at 238, and when reviewing whether a warrant was supported by probable cause, the court is "limited to the information and circumstances contained within the four corners of the underlying affidavit," *United States v. Bergren*, No. C 12-00119 SI, 2014 WL 1217981, at *3 (N.D. Cal. Mar. 21, 2014) (citing *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985), *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985)). "Search warrants must be specific in both particularity and breadth." *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009). Thomas moves to exclude the warrant on two grounds: staleness and overbreadth.

***4** "Information offered to support a search warrant application becomes stale when ... there is no longer sufficient basis to believe ... that the items to be seized are still on the premises." *United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) (citation omitted). Staleness is evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (citation omitted). Mere passage of time may be relevant but is not dispositive. *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information may not be stale, particularly if evidence "is of an ongoing criminal business of a necessarily long-term nature").

Claussen relied on a series of texts when authoring his request for a warrant, the last of which was sent three months before he prepared his affidavit. At the time of the affidavit, Claussen also had not confirmed that the phone number was still associated with Thomas. Nonetheless, Claussen attested in his affidavit that the texts established that Thomas was actively selling because the texts went back as early as March, which Claussen "believe[d] show[ed] a pattern" of behavior in which Thomas would still be engaging. Claussen also attested that "based on [his] training and experience [ ] individuals do not just stop selling narcotics and will continue to sell after being arrested."

When evaluating staleness, a court may treat drug trafficking cases—where the "ongoing" nature of the crime provides sufficient reason to assume the behavior has continued—differently than other forms of crime. *United States v. Camarillo*, No. CR-09-2023-EFS, 2009 WL 10677827, at *7 (E.D. Wash. Nov. 24, 2009), *aff'd*, 422 F. App'x 566 (9th Cir. 2011); *see also Pitts*, 6 F.3d at 1370 ("With respect to drug trafficking, probable cause may continue for several weeks, *if not months*, of the last reported instance of suspect activity") (citation omitted); *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) (concluding that the "ongoing nature" of marijuana cultivation overcame allegations of staleness when the information at issue was five and a half months old); *Greany*, 929 F.2d at 525 (noting that the "necessarily long-term nature" of marijuana cultivation overcame allegations of staleness when information was two years old); *United States v. Walker*, No. 3:25-CR-00014-TMB-KFR, 2025 WL 2608136, at *6 (D. Alaska Sept. 9, 2025) ("The Ninth Circuit has repeatedly recognized that lapses of several months do not render information in an affidavit stale in the context of an ongoing drug trafficking offense.") (cleaned up). While some of these cases involved operations that were necessarily more long-term (like marijuana farming), the scale of what Thomas himself claimed to have been doing suggests enough criminal momentum to overcome any allegations of staleness.

Thomas suggests that *Durham v. United States*, 403 F.2d 190 (9th Cir. 1968) requires a finding of staleness here. [2] But *Durham* involved a greater lapse in time, was decided almost seventy years ago, and noted that neither the government nor the Ninth Circuit could find a case that sustained a search warrant issued more than 30 days after the supporting evidence came to light. *Id.* at 194 n.6. Since then, courts have distinguished between completed and ongoing criminal activity. *United States v. Huberts*, 637 F.2d 630, 638 (9th Cir. 1980). In *Huberts*, for example, the court found that a coconspirator's statement that they were "involved

in the business of [the illegal activity]" was sufficient to overcome a staleness challenge. Here, too, Thomas's statements provide evidence of ongoing activity. The text messages spanned three months, during which Thomas offered to sell drugs to the text recipient multiple times. Thomas texted that he "used to move the most weight in town," that he "got the best shit you'll ever try," and inquired whether the receiver of the texts would consider working for him. Taken together, these facts are enough to preclude a finding of staleness. *See Pitts*, 6 F.3d at 1369 (requiring only a "reasonable nexus" between activities supporting probable cause and the locations to be searched, not direct evidence that the items listed on the warrant are on the premises to be searched).

2 While Thomas also cites more recent case law applying staleness to suppress evidence, none of those cases involved such a truncated period of time, and only one was about drug trafficking. *See United States v. Boozer*, 511 F. Supp. 3d 1128, 1138 (D. Or. 2021) (information about distribution and possession of child pornography stale after 13 months); *United States v. Greathouse*, 297 F. Supp. 2d 1264 (D. Or. 2003) (same); *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006) (information about drug trafficking stale where there was no accompanying detail on how old the information was).

***5** A warrant is not overbroad if it is "limited by the probable cause on which the warrant is based." *United States v. Holcomb*, 183 F.4th 704, 713 (9th Cir. 2026) (citing *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009)). Thomas argues that the request for real-time location tracking for thirty days was impermissibly overbroad. But as shown above, there was sufficient probable cause to support the inference that Thomas was actively dealing drugs. The warrant was time-bound, limited to a particular place (a specific cell phone) and the item seized (the location information seized from that phone). *See United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013) (per curiam).[3] Additionally, the affidavit established a long-term pattern of traveling between Santa Cruz and Oakland to procure drugs. Other courts have found that similar patterns supported location tracking for even longer. *See, e.g., United States v. Rhodes*, No. 3:19-CR-00333-IM, 2022 WL 1261811, at *10 (D. Or. Apr. 28, 2022) (concluding that fifteen-month location tracking warrant was not overbroad).

3 Thomas argues that any case involving cell-site location information that was decided before *Carpenter v. United States*, 585 U.S. 296 (2018), should be ignored. But *Carpenter* involved a *warrantless* search for CSLI data. *Gibbs* involved a valid (and therefore particularized) warrant.

Accordingly, probable cause supported the location-tracking warrant. The Court therefore declines to suppress any evidentiary fruits of that warrant.

### 2. Flock Database

"[I]ndividuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 585 U.S. at 310. Thomas argues that Claussen's access of the Flock database to track his movements was an unconstitutional infringement on his reasonable expectation of privacy. The government argues that the Flock queries are not searches because they do not reveal the whole of a defendant's physical movements.[4]

4 The government also argues that Thomas lacks standing to challenge this evidence. But "[a] person may have a legitimate expectation of privacy in a place or object he does not own." *United States v. Perez*, 689 F.2d 1336, 1338 (9th Cir. 1982). Further, "[a] [ ] driver may have standing to challenge a search if he or she has received permission to use the car." *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006). Thomas regularly used his girlfriend's car and had permission to use it when he was stopped on September 18, 2024. He therefore has standing.

"The Government's position fails to contend with the seismic shifts in digital technology that made possible the tracking of not only [Thomas's] location but also everyone else's, not for a short period but for years and years." *Carpenter*, 585 U.S. at 313. In *Carpenter*, the Supreme Court considered whether access to a defendant's cell-site location information ("CSLI") was a search. Much like GPS tracking of a vehicle, which the Supreme Court had previously determined constitutes a search, *United States*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*v. Jones*, 565 U.S. 400 (2012), CSLI is “detailed, encyclopedic, and effortlessly compiled.” *Carpenter*, 585 U.S. at 309. CSLI datapoints in isolation resemble nothing more than a “nosy neighbor who keeps an eye on comings and goings.” *Id.* at 313–14. But the amalgamation and accumulation of those datapoints transform the nosy neighbor into a constant surveyor with an infallible memory. For that reason, the Supreme Court concluded that a police request for CSLI constitutes a search. *Carpenter* was careful, however, to limit its coverage to the new technology at issue and declined to extend its holding to “conventional surveillance techniques and tools, such as security cameras.” *Id.* at 316.

Flock is a private automatic license plate recognition (ALPR) company. ALPRs are computer-controlled camera systems that automatically capture license plate numbers, along with other details like the vehicle make and model, and possibly photos of the driver or passengers in the car. The question under *Carpenter* is whether the Flock database is more like a security camera or CSLI data. Unfortunately, the record before the Court is inadequate for the Court to decide that issue. Without more information on how Flock works and how Claussen used the data he received, the Court cannot determine whether its use constituted an intrusion into Thomas's constitutionally protected privacy rights and, if so, whether that warrantless intrusion requires suppression of any evidence. *See United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017), *order corrected*, 870 F.3d 963 (9th Cir. 2017) (“[E]vidence qualifies as ‘fruit of the poisonous tree’ when ‘the illegal activity tends to significantly direct the investigation to the evidence in question.’ ... ‘The focus...is on the causal connection between illegality and the evidence.’ ”) (quoting *United States v. Johns*, 891 F.2d 243 (9th Cir. 1989)). The Court therefore grants Thomas's motion for an evidentiary hearing. Claussen shall be made available for examination by both the parties and the Court regarding his access to the Flock data. The parties shall also present evidence on how a typical Flock search works and on what information is available to police officers through their use of Flock.

### 3. September 18 Vehicle Search

***6** After observing Thomas driving with tinted windows and over the speed limit, Claussen conducted a valid *Terry* investigative stop. While another officer approached the car and spoke to Thomas, Claussen deployed Goose, who alerted to the presence of drugs within seven seconds of being released from his crate. [5] Claussen searched the car, seizing suspected drugs, paraphernalia, a scale, and a cell phone. Thomas now contends that Goose's alert did not provide probable cause for the vehicle search.

5 “[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.” *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). “[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's ‘mission’—to address the traffic violation that warranted the stop and attend to related safety concerns.” *Id.* at 354 (citations omitted). Thomas argues that Goose's search extended the duration of the stop and seeks to suppress the evidence under *Rodriguez.* But the video, warrant, and declaration all indicate that Goose was deployed for less than a minute, during which time another officer was taking Thomas's information and beginning the process of ticketing him. The use of a “well-trained narcotics-detection dog” during a lawful traffic stop that does not extend the investigation is not a fourth amendment violation. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). There is no indication here that Goose's deployment extended the stop by any time at all.

There is no bright-line test for establishing probable cause in a K9 search. *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013) (citing *Fla. v. Harris*, 568 U.S. 237, 244 (2013)). “Whether a particular dog displays enough signaling behavior will depend on the facts and circumstances of each case.” *Id.* Generally, a court evaluating probable cause will look to the details of the search itself, data on the dog's field performance, and training records. A court should not place too much weight on a dog's field performance, however, as in “most cases [field performance reports] have relatively limited import.” *Harris*, 568 U.S. at 245. Instead, “[t]he better measure of a dog's reliability ... comes away from the field, in controlled testing environments.” *Id.* at 246.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs....
>
> If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence.

*Id.* at 246–48.

In *Harris*, the Supreme Court relied upon evidence of a 120-hour drug-detection program, an independent certification, and weekly training to support its conclusion that the dog was reliable.[6] The circumstances supporting probable cause for Goose's search are far weaker than those present in *Harris.* Jerry Potter, Thomas's K9 expert, opines that the search was "extremely fast [ ] even under the most ideal circumstances." He states that Goose's "panting and whining" while he was deployed was not searching or alerting behavior. He notes that Goose's training records contain no information about the entity or organization that provided the certification or who the "certifying official" was who signed the form. Potter also opines that Goose's training hours were inflated, though he does not provide any explanation for that opinion.

6 Because the defendant never challenged the sufficiency of the training before the trial court, the Supreme Court declined to consider that issue. *Id.* 248.

***7** The government's witness Heath Kuhlmann does little to rebut Potter's evidence or even provide much information specific to the record. Kuhlmann notes that *if* the certifying officials were from the California Commission on Peace Officer Standards and training, they would have possessed the kind of bona fides that the Supreme Court noted in *Harris.* He does not, however, identify any reason to think that the officials were in fact from such an organization. Kuhlmann next muses that Goose's fast search could have been because he was "in odor" and smelling the drugs before he was near the vehicle. But he did not opine on how common it is for a K9 to alert that quickly, nor does he comment on whether Goose's behavior actually supported the assertion that he was conducting a sniff search. Finally, while Potter comments on Goose's field records (and finds them lacking, as Goose alerts close to 100% of the times he is deployed), Kuhlmann does not, instead generally remarking that "law enforcement canine handlers assigned to narcotic task forces could have higher alert and find rates than canine handlers assigned to regular patrol duties."

The record before the Court demonstrates contested issues of fact as to the reliability of Goose's purported alert on Thomas's car. *Ramirez-Garcia*, 269 F.3d at 947. The Court will therefore hold an evidentiary hearing regarding whether the search of Thomas's car was supported by probable cause.[7] Both Claussen and the parties' K9 experts shall be made available for examination by the parties and the Court.

7 The government also argues that it had probable cause to search the vehicle even without Goose's alert, relying on *United States v. Diaz-Rosas*, 13 F.3d 1305, 1306–07 (9th Cir.1994). In *Diaz-Rosas*, the Ninth Circuit found probable cause to stop a vehicle where a reliable confidential informant told officers that the driver "would be carrying drugs from Seattle to Portland in a dark Mercedes on November 5, 1991." *Id.* The facts here are distinguishable, as Claussen had no specific evidence suggesting the drugs would be in Thomas's car at the precise moment he was stopped. *See Gates*, 462 U.S. 213, 238–39, 103 (1983) (probable cause exists "if there is a fair probability that contraband ... will be found in a particular place").

**II. Motion to Dismiss**

Thomas moves to dismiss the indictment under the Sixth Amendment, Fifth Amendment, and for outrageous government conduct, contending that Claussen violated Thomas's constitutional rights by communicating directly with Thomas from November 5 through November 19 even though Thomas was represented by counsel by that time.

The Sixth Amendment guarantees the right to council "[i]n all criminal prosecutions." U.S. Const. amend. VI. It attaches to any critical stage of a criminal proceeding, or an "adversar[ial]" "confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice." *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (citation omitted). The right extends to the "cooperation period," where counsel may advise, among other things, "about whether and when to cooperate." *Id.* at 1117, 1118.

The right to counsel is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 167 (2001). To determine the scope of an offense, a court applies the *Blockburger* test. If "the same act or transaction constitutes a violation of two distinct statutory provisions," then a court asks "whether each provision requires proof of a fact which the other does not." *Id.* at 173 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "[W]hen the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Id.* at 173.

Thomas's right to counsel attached at the September 20, 2024, arraignment. The government contends, however, that Claussen's communications with Thomas from November 5 through November 19 do not implicate his right to counsel in this case because the federal charges do not involve the same offense. The Court must therefore determine if the federal charges are an extension of the original state offense or an entirely new one.

***8** The facts required to prove a violation of 21 U.S.C. § 841(a)(1) and Cal. H&S § 11351 are the same. *Compare* 21 U.S.C. § 841(a)(1) (unlawful to knowingly "possess with intent to ... distribute... a controlled substance") *with* Cal. H&S § 11351 (unlawful to "possess for sale ... any controlled substance"). The government nonetheless argues that the two offenses are distinct on the basis of the dual-sovereignty doctrine, which holds that "a crime under one sovereign's laws is not 'the same offence' as a crime under the laws of another sovereign." *Gamble v. United States*, 587 U.S. 678, 681 (2019). But the Ninth Circuit has never recognized the dual-sovereignty exception to *Cobb*, and there is no reason for the Court to read that exception into the decision. *See United States v. Mills*, 412 F.3d 325, 330 (2d Cir. 2005) ("The fact that *Cobb* appropriates the *Blockburger* test, applied initially in the double jeopardy context, does not demonstrate that *Cobb* incorporates the dual sovereignty doctrine."). Holding otherwise would allow one sovereign to question a defendant in violation of his Sixth Amendment rights, then share the information with the other sovereign without fear of repercussions. *Id.* The Court declines to extend the dual-sovereignty doctrine in a manner that would eviscerate Thomas's fundamental constitutional rights.

"Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Patterson v. Illinois*, 487 U.S. 285, 290 n.3 (1988). Those rights may only be waived if the waiver is voluntary, knowing, and intelligent. *Michigan v. Harvey*, 494 U.S. 344, 345 (1990). Even then, if the waiver is "secured pursuant to police-initiated conversation," it is presumed invalid. *Id.*

The government argues Thomas waived his right to counsel by initiating his communications with Claussen. But the government fails to contend with the fact that Thomas was never *Mirandized* during his second arrest. There is no doubt that he was subject to a custodial interrogation, as his conversations with the police occurred in a cruiser and County Sherriff's Office, all pursuant to an arrest for possession of controlled substances. Even accepting the government's assertion that Thomas initiated conversation with the police, "initiation" itself does not amount to waiver. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). Instead, to determine whether initiation of a conversation by a suspect amounts to waiver of a previously attached right to counsel and privilege against self-incrimination, a court must determine whether that waiver was knowing and voluntary. *See Rodriguez v. McDonald*, 872 F.3d 908, 921 (9th Cir. 2017). Establishing a knowing and voluntary waiver presents a "heavy burden." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010).

"The validity of a waiver depends in each case 'upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' " *Rodriguez*, 872 F.3d at 922 (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). "A confession is considered involuntary if 'the government obtained the statement by physical or psychological coercion or by improper inducement.' " *Id.* (citing *United States v. Male Juv.*, 280 F.3d 1008, 1022 (9th Cir. 2002)). While courts have found that a suspect may validly waive his constitutional rights even in a custodial setting after initiating conversation, those defendants were almost always advised of their *Miranda* rights. *See, e.g., United States v. McCowan*, 2018 WL 1026784, at *17 (D. Ariz. Feb. 2, 2018), *report and recommendation adopted*, 2018 WL 993756 (D. Ariz. Feb. 21, 2018) (defendant validly waived her rights after invoking right to counsel by initiating conversation from the back of a police cruiser after an arrest and being re-advised of her *Miranda* rights). Still, the Court recognizes that Thomas's repeated prompting of conversation renders the question of voluntariness a close one.

Even a voluntary waiver, however, must also be knowing and intelligent. In evaluating those requirements, the court considers:

> ***9** (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*United States v. Chapman*, No. 24-4939, 2026 WL 2261326, at *10 (9th Cir. Aug. 5, 2026) (citing *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007)).

The government's only support for its argument that Thomas's waiver of his right to counsel was knowing and intelligent is that Thomas's arrest six weeks earlier was sufficient to familiarize him with those rights and that, during the conversation with the officers, Thomas was warned that he hadn't yet been read his *Miranda* rights. This is not sufficient to satisfy the government's burden. *Cf. id.* at *11 (concluding that waiver was valid where defendant was previously exposed to the criminal justice system, brought up his own *Miranda* rights "several times," received a verbal *Miranda* warning, and signed a written waiver). Accordingly, the government has not established that Thomas's waiver was valid.

Still, dismissal of an indictment is generally not required where suppression will suffice. *See United States v. Parga-Rosas*, 238 F.3d 1209, 1212 (9th Cir. 2001). The defense does not demonstrate that Thomas is entitled to such an "extreme remedy," *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993), particularly given that the government intends to prove its case-in-chief entirely on the basis of evidence generated more than a month before the interactions at issue. While the Court is skeptical that Claussen was unaware Thomas was represented by counsel, there is no evidence that Claussen *intentionally* interfered with Thomas's rights as opposed to merely acting without appropriate care to protect those rights. The Court therefore declines to dismiss the indictment but grants suppression of any statements obtained during the November 5 transport to the Sherriff's office, the subsequent interview, and any further communications between Claussen and Thomas. [8]

8 Thomas also moves to dismiss the case for outrageous conduct. "Outrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' " *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). It is an "extremely high standard" to meet, *id.* (citation omitted), and evaluated through the totality of the circumstances, *United States v. Ahluwalia*, 807 F. Supp. 1490, 1496 (N.D. Cal. 1992), *aff'd*, 30 F.3d 1143 (9th Cir. 1994). The Court is aware of only two cases in this district where violations of the defendant's Sixth Amendment rights necessitated dismissal. *United States v. Batres-Santolino*, 521 F. Supp. 744 (N.D. Cal. 1981); *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991). The facts here are not analogous and do not satisfy the extremely high standard necessary for dismissal on that basis.

**III. Motion to Unseal and Compel**

On March 6, 2026, in the course of litigating the above motions, the defense submitted a written discovery request to the government under Federal Rule of Criminal Procedure 16, *Brady*, and the Fifth Amendment. After the government failed to formally respond to the request, the defense then applied for and received a pretrial subpoena duces tecum under Fed. R. Evid. 17(c) for materials in the possession of SCCSO. The application was submitted ex parte under Crim. Local Rule 17-2(a)(1). The magistrate judge assigned to the case granted the subpoena. SCCSO responded by providing certain requested materials and did not move to quash, modify, or otherwise limit the subpoena.

***10** The government now moves to unseal the request for the ex parte subpoena along with any other ex parte subpoenas that have been approved and to compel disclosure of all materials received in response. It also requests exclusion of the materials from Thomas's criminal proceedings. The government bases its motion on the argument that Thomas used Rule 17(c) "as an end run around established criminal discovery rules," and that the government was therefore "prevented from making a timely assertion of its privilege."

Rule 17(c) is not intended to provide a means for conducting discovery but instead helps expedite trial by providing a pre-trial time and place for the inspection of subpoenaed materials. *United States v. Nixon*, 418 U.S. 683, 698–99 (1974). A Rule 17(c) request "requires a showing of relevancy, admissibility, and specificity to support the issuance of a subpoena duces tecum." *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984). "Enforcing or quashing Rule 17(c) subpoenas is within the discretion of the [magistrate] judge and will not be disturbed unless clearly arbitrary or without support in the record." *Id.*; *see also Grimes v. City & County of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991) (noting that a district court may not overturn "[a] non-dispositive order entered by a magistrate ... unless it is 'clearly erroneous or contrary to law' ") (quoting Fed. R. Civ. P. 72(a), 28 U.S.C. § 636(b)(1)(A)). Because the government does not ask for or make any argument that the original order issuing the subpoena was clearly arbitrary or without support in the record, the Court will not revisit the magistrate judge's prior ruling on the issuance or scope of the subpoena.

A party may access a sealed Rule 17(c) subpoena only if they demonstrate a special need. *United States v. Sleugh*, 896 F.3d 1007, 1015 (9th Cir. 2018). Although the government does not cite to *Sleugh*, which establishes the circuit standard for determining a third party's access to a Rule 17(c) subpoena and is therefore binding law, the Court interprets the government's "special need" to be preventing the dissemination of privileged information under both the work-product doctrine and the deliberative process privilege.

The work-product doctrine protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (citation omitted). "In order to be protected by the deliberative process privilege, "a document must be both (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which policies are formulated." *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000). Documents are "deliberative" if "they contain[ ] opinions, recommendations, or advice about agency policies." *Id.* (citation omitted). Unlike the plaintiff in *Sleugh* who was unable to point to any reason to expect that the subpoena applications contained relevant information, the subpoena here led to the disclosure of communication between government lawyers, federal agencies, and state law enforcement officers. While the Court is not convinced that the material disclosed in Thomas's briefing is privileged, it acknowledges that there is a possibility that other responsive documents could be.

While the responsive documents may "go to the merits of a case" and therefore not subject to the high standard required to compel disclosure of a defendant's Rule 17(c) subpoena, Thomas's Rule 17(c) application itself is entitled significant protections. *Sleugh*, 896 F.3d at 10144. An application and supporting affidavits "are not evidence themselves," but "could reveal counsel's trial strategies or defense theories to the opposing." *Id.* at 1012, 1014. Because "[Thomas] has a constitutional right to compulsory process in building a defense, *id.* at 1012, and because unsealing his subpoena could result in the improper disclosure of his counsel's strategies and theories, the Court declines to unseal his ex parte application. The government's privilege concerns can be adequately addressed if the government is provided with copies of all materials received in response to the subpoena. After

reviewing those materials, the government may assert privilege as to any documents it believes warrant such a designation, and Thomas may contest that assertion. The defense shall provide the government with all discovery produced in response to the subpoena within 30 days of the issuance of this order.

***11 IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 2656384

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.